Harrison J. (Buzz) Frahn IV (SBN 206822)
SIMPSON THACHER & BARTLETT LLP
2475 Hanover Street
Palo Alto, California 94304
Telephone: (650) 251-5000
hfrahn@stblaw.com

Paul C. Gluckow (*pro hac vice*)
Alan Turner (*pro hac vice*)
SIMPSON THACHER & BARTLETT LLP
425 Lexington Avenue
New York, New York 10017
Telephone: (212) 455-2000
pgluckow@stblaw.com
aturner@stblaw.com

Abram Ellis (*pro hac vice*)
SIMPSON THACHER & BARTLETT LLP
900 G Street, NW
Washington, DC 20001
Telephone: (202) 636-5500
aellis@stblaw.com

*Counsel for Defendants JPMorgan Chase & Co.,*
*JPMorgan Chase Bank, N.A., and*
*J.P.Morgan Securities LLC*

ADDITIONAL PARTIES AND COUNSEL
LISTED ON SIGNATURE PAGE

# UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| LISA MCCARTHY, *et al.*,<br><br>     Plaintiffs,<br><br>  v.<br><br>INTERCONTINENTAL EXCHANGE, INC.,<br>*et al.*,<br><br>     Defendants. | Case No. 3:20-cv-05832-JD<br><br>**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY AND PERMANENT INJUNCTION**<br><br>Date:    December 22, 2020<br>Time:    11:00 a.m.<br>Courtroom: 11, 19th floor<br>Before the Honorable James Donato |

# <u>TABLE OF CONTENTS</u>

**Page**

I.    INTRODUCTION ................................................................................................ 1

II.   PLAINTIFFS HAVE NO LIKELIHOOD OF SUCCESS ON THE MERITS ..................... 2

    A.    Plaintiffs' Sherman Act Claims Have No Legal Or Factual Merit ........................... 2

    B.    Plaintiffs Lack Standing To Assert Antitrust Claims ................................................ 5

    C.    LIBOR's Comprehensive Regulatory Regime Conflicts With Plaintiffs'
        Allegations And The Injunctive Relief They Seek .................................................... 7

    D.    Plaintiffs Fail To Demonstrate Personal Jurisdiction Over Defendants .................. 9

III.  PLAINTIFFS WILL SUFFER NO IRREPARABLE HARM ............................................ 10

IV.   THE BALANCE OF EQUITIES TIPS STRONGLY AGAINST PLAINTIFFS ............... 12

V.    PLAINTIFFS' INJUNCTION WOULD DISSERVE THE PUBLIC INTEREST ............. 14

VI.   CONCLUSION ................................................................................................... 15

# **TABLE OF AUTHORITIES**

## **CASES**

*7 W. 57th St. Realty Co., LLC v. Citigroup, Inc.*,
    771 F. App'x 498 (2d Cir. 2019) ............................................................................ 6

*Animal Science Prods., Inc. v. Hebei Welcome Pharm. Co.*,
    138 S. Ct. 1865 (2018) ........................................................................................... 9

*Avila-Martinez v. Wells Fargo Bank, N.A.*,
    2011 WL 3876000 (E.D. Cal. Aug. 31, 2011) ..................................................... 11

*Blind Doctor Inc. v. Hunter Douglas, Inc.*,
    2004 WL 1976562 (N.D. Cal. Sept. 7, 2004) ...................................................... 13

*Bright Lite Structures, LLC v. Balform, Ltd.*,
    2020 WL 2218967 (N.D. Cal. May 7, 2020) ....................................................... 10

*Brown v. United States*,
    951 F.2d 358 (9th Cir. 1991) ............................................................................... 11

*Brunnen v. Mission Ranch*,
    1998 WL 34032533 (N.D. Cal. Nov. 24, 1998) .................................................. 11

*Charles Schwab Corp. v. Bank of Am. Corp.*,
    883 F.3d 68 (2d Cir. 2018) ............................................................................ 10, 12

*Credit Suisse Sec. (USA) LLC v. Billing*,
    551 U.S. 264 (2007) ............................................................................................... 8

*Dahl v. HEM Pharm. Corp.*,
    7 F.3d 1399 (9th Cir. 1993) ................................................................................... 2

*Daimler AG v. Bauman*,
    571 U.S. 117 (2014) ......................................................................................... 9, 10

*Epic Games, Inc. v. Apple Inc.*,
    2020 WL 5993222 (N.D. Cal. Oct. 9, 2020) ....................................................... 15

*Fed. Trade Comm'n v. Qualcomm Inc.*,
    969 F.3d 974 (9th Cir. 2020) ................................................................................. 5

*Freeman v. San Diego Ass'n of Realtors*,
    322 F.3d 1133 (9th Cir. 2003) ............................................................................... 3

*Garcia v. Google, Inc.*,
    786 F.3d 733 (9th Cir. 2015) ................................................................................. 2

*Gelboim v. Bank of America Corp.*,
    823 F.3d 759 (2d Cir. 2016) ................................................................................... 4

*Gerlinger v. Amazon.com Inc.*,
    526 F.3d 1253 (9th Cir. 2008) ............................................................................... 6

*Go-Video, Inc. v. Akai Elec. Co., Ltd.*,
   885 F.2d 1406 (9th Cir. 1989) ............................................................................ 10

*Healthy Harvest Berries, Inc. v. Rodriguez*,
   2014 WL 975321 (E.D. Cal. Mar. 12, 2014) ...................................................... 13

*Hip Hop Beverage Corp. v. Monster Energy Co.*,
   2016 WL 7324091 (C.D. Cal. Oct. 26, 2016) ...................................................... 5

*In re ATM Fee Antitrust Litig.*,
   554 F. Supp. 2d 1003, 1012 (N.D. Cal. 2008) ................................................... 3

*In re German Auto. Mfrs. Antitrust Litig.*,
   2020 WL 1542373 (N.D. Cal. Mar. 31, 2020) .................................................. 3

*In re ICE LIBOR Antitrust Litig.*,
   2020 WL 1467354 (S.D.N.Y. Mar., 26, 2020) ................................................... 7

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*,
   2016 WL 7378980 (S.D.N.Y. Dec. 20, 2016) ................................................... 7

*In re LIBOR–Based Fin. Instruments. Antitrust Litig.*,
   2015 WL 6243526 (S.D.N.Y. Oct. 20, 2015) .................................................... 9

*In re Vitamin C Antitrust Litig.*,
   837 F.3d 175 (2d Cir. 2016) ............................................................................... 9

*Innospan Corp. v. Intuit, Inc.*,
   2010 WL 5157157 (N.D. Cal. Dec. 3, 2010) .................................................... 11

*Jones v. Micron Tech.*,
   400 F. Supp. 3d 897 (N.D. Cal. 2019) ............................................................. 6

*Keeton v. Hustler Magazine, Inc.*,
   465 U.S. 770 (1984) .......................................................................................... 10

*Kiobel v. Royal Dutch Petrol. Co.*,
   569 U.S. 108 (2013) ............................................................................................ 9

*La Clinica De La Raza, Inc. v. Cal. Dep't of Health Care Servs.*,
   2015 WL 5315964 (N.D. Cal. Sept. 11, 2015) ................................................ 12

*Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*,
   551 U.S. 877 (2007) ............................................................................................ 2

*Lenhoff Enters., Inc. v. United Talent Agency, Inc.*,
   2015 WL 7008185 (C.D. Cal. Sept. 18, 2015) ................................................. 5

*Los Gatos Mercantile, Inc. v. E.I. DuPont De Nemours & Co.*,
   2015 WL 4755335 (N.D. Cal. Aug. 11, 2015) .................................................. 6

*Lucas Auto. Eng'g v. Bridgestone/Firestone, Inc.*,
   140 F.3d 1228 (9th Cir. 1998) ........................................................................... 6

iii

*Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*,
    571 F.3d 873 (9th Cir. 2009) ............................................................................ 2, 13

*Martin v. Int'l Olympic Comm.*,
    740 F.2d 670 (9th Cir. 1984) ................................................................................. 2

*Martinez v. Aero Caribbean*,
    764 F.3d 1062 (9th Cir. 2014) ............................................................................... 9

*Mujica v. AirScan Inc.*,
    771 F.3d 580 (9th Cir. 2014) ................................................................................. 8

*O'Bannon v. Nat'l Collegiate Athletic Ass'n*,
    802 F.3d 1049 (9th Cir. 2015) ............................................................................... 5

*Open Text, S.A. v. Box, Inc.*,
    36 F. Supp. 3d 885 (N.D. Cal. 2014) .................................................................. 11

*Panavision Int'l, L.P. v. Toeppen*,
    141 F.3d 1316 (9th Cir. 1998) ............................................................................... 9

*Park Village Apt. Tenants Ass'n v. Mortimer Howard Trust*,
    636 F.3d 1150 (9th Cir. 2011) ............................................................................. 14

*Perfect 10, Inc. v. Google, Inc.*,
    653 F.3d 976 (9th Cir. 2011) ............................................................................... 12

*Picot v. Weston*,
    780 F.3d 1206 (9th Cir. 2015) ............................................................................. 10

*Protech Diamond Tools, Inc. v. Liao*,
    2009 WL 1626587 (N.D. Cal. June 8, 2009) ...................................................... 11

*R.C. Dick Geothermal Corp. v. Thermogenics, Inc.*,
    890 F.2d 139 (9th Cir. 1989) ................................................................................. 7

*Reilly v. Medianews Grp., Inc.*,
    2006 WL 2419100 (N.D. Cal. July 28, 2006) .................................................... 11

*Rent-A-Center, Inc. v. Canyon Television & Appliance Rental, Inc.*,
    944 F.2d 597 (9th Cir. 1991) ............................................................................... 11

*Reveal Chat Holdco, LLC v. Facebook, Inc.*,
    2020 WL 3969064 (N.D. Cal. July 8, 2020) ........................................................ 7

*Sammartano v. First Judicial Dist. Court*,
    303 F.3d 959 (9th Cir. 2002) ............................................................................... 14

*Sierra On-Line, Inc. v. Phoenix Software, Inc.*,
    739 F.2d 1415 (9th Cir. 1984) ........................................................................ 2, 13

*Spokeo, Inc. v. Robins*,
    136 S. Ct. 1540 (2016) ......................................................................................... 5

iv

*State Oil v. Khan*,
  522 U.S. 3 (1997) ........................................................................................ 2

*Stormans, Inc. v. Selecky*,
  586 F.3d 1109 (9th Cir. 2009) ................................................................... 14

*Texaco Inc. v. Dagher*,
  547 U.S. 1 (2006) ...................................................................................... 2, 3

*United Nat'l Maint., Inc. v. San Diego Convention Ctr. Corp., Inc.*,
  2008 WL 11333629 (S.D. Cal. Feb. 19, 2008) ......................................... 12

*United States v. Socony-Vacuum Oil Co.*,
  310 U.S. 150 (1940) ..................................................................................... 4

*Verizon Commc'ns, Inc. v. Law Offices of Curtis V. Trinko, LLP*,
  540 U.S. 398 (2004) ..................................................................................... 8

*Walden v. Fiore*,
  571 U.S. 277 (2014) ................................................................................... 10

*Winter v. Nat. Res. Def. Council, Inc.*,
  555 U.S. 7 (2008) ......................................................................................... 2

*Yazzie v. Hobbs*,
  977 F.3d 964 (9th Cir. 2020) ....................................................................... 5

*Young v. Third & Mission Assocs., LLC*,
  2014 WL 4382997 (N.D. Cal. Sept. 4, 2014) ............................................ 14

## I.   INTRODUCTION

This is a meritless lawsuit and a frivolous preliminary injunction motion.  Plaintiffs—none of whom has presented evidence of ever paying interest based on the LIBOR benchmark rate—ask this Court to unwind every "financial instrument" that "rel[ies] in whole or in part" on LIBOR, and to forbid even the calculation and publication of LIBOR.  Mot. at 1.[1]  Plaintiffs' extraordinary request—which would wreak havoc on global financial markets and undermine years of work on LIBOR reform—is predicated on baseless theories of antitrust liability and incorrect and unsupported factual premises.  Plaintiffs fail to meet any of the most basic prerequisites for such a far-reaching and consequential mandatory injunction, and their motion should be denied.

Plaintiffs claim that LIBOR "is commonly accepted as 'the world's most important number'" and that "[i]t is used in an estimated US $350,000,000,000,000 of outstanding contracts." Mot. at 1.  The global financial community has been carefully planning for the eventual transition from LIBOR to alternative benchmarks through a phase-out process supervised by financial regulators and central banks.  The Federal Reserve has described this phase-out as one of the "most significant and complex challenges that financial markets will ever confront," involving "years of preparation, thoughtful consideration, and countless conversations."[2]  Due to the massive volume and broad range of financial instruments that reference LIBOR, regulators have cautioned that the transition must be carried out carefully and deliberately, and that an abrupt or disorderly termination of LIBOR—or even a temporary disturbance of LIBOR—could devastate global markets.

Yet that is precisely what Plaintiffs—27 individuals who do not even purport to represent a class—ask this Court to do.  Plaintiffs, however, cannot satisfy *any* of the prerequisites for a preliminary injunction.  Plaintiffs fail to identify a legally cognizable theory of liability.  No Plaintiff alleges having entered into a LIBOR-based financial instrument, and thus none can claim

---

[1] This opposition is filed on behalf of the Defendants listed on the signature pages.  Certain other Defendants identified in the Complaint have not been served and thus do not join this opposition.  All emphases herein are added and internal quotations and citations are omitted.  Plaintiffs' brief (ECF No. 19) is cited as "Mot. at __" and the Declaration of Patricia Plonsker (ECF 19-2) is cited as "Plonsker Decl. ¶ __.  Exhibit citations are to the Declaration of Harrison J. (Buzz) Frahn IV.  The Reports of Dr. Gregory Brown and of Dr. Pierre-Yves Cremieux are cited as "Brown ¶ __" and "Cremieux ¶ __."  References to LIBOR are to U.S. Dollar LIBOR.

[2] Ex. 1 (Fed. Reserve Bank of N.Y., *Transitioning Away From LIBOR: Understanding SOFR's Strengths and Considering the Path Forward* (Sept. 18, 2020)).

any harm, let alone irreparable harm, based on Plaintiffs' meritless theory that LIBOR inherently violates the antitrust laws. Moreover, preliminary injunctive relief is "a device for *preserving* the status quo and preventing the irreparable loss of rights before judgment." *Sierra On-Line, Inc. v. Phoenix Software, Inc.*, 739 F.2d 1415, 1422 (9th Cir. 1984). Yet the injunction Plaintiffs seek would massively disrupt, not preserve, the status quo, calling into question the validity and enforceability of a vast number of LIBOR-based contracts involving innumerable counterparties not before the Court, while providing no discernible benefit to Plaintiffs. Preliminary injunctions that *change* the status quo—like the one sought here—are "particularly disfavored" and "are not granted unless extreme or very serious damage will [otherwise] result." *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 879 (9th Cir. 2009).[3] Plaintiffs' motion utterly fails to meet this demanding standard, and should be summarily denied.[4]

## II.     PLAINTIFFS HAVE NO LIKELIHOOD OF SUCCESS ON THE MERITS

### A.     Plaintiffs' Sherman Act Claims Have No Legal Or Factual Merit

Plaintiffs' *per se* Sherman Act claim is entirely meritless, and is therefore far from "likely to succeed." *Per se* antitrust liability is "reserved for only those agreements that are so plainly anticompetitive that no elaborate study of the industry is needed to establish their illegality." *Texaco Inc. v. Dagher*, 547 U.S. 1, 5 (2006). "To justify a *per se* prohibition a restraint must have manifestly anticompetitive effects . . . and lack . . . any redeeming virtue." *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 886 (2007). Thus, the Supreme Court has "expressed reluctance to adopt *per se* rules . . . 'where the economic impact of certain practices is not immediately obvious.'" *Dagher*, 547 U.S. at 5 (quoting *State Oil v. Khan*, 522 U.S. 3, 10 (1997)).

Here, Plaintiffs allege that the highly regulated process of setting a benchmark that is a fundamental part of the global economy is a *per se* antitrust violation. But legitimate cooperative

---

[3] *See also Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015) (plaintiff's burden is "doubly demanding" if seeking mandatory injunction); *Dahl v. HEM Pharm. Corp.*, 7 F.3d 1399, 1403 (9th Cir. 1993) (request for mandatory injunction "subject to heightened scrutiny and should not be issued unless the facts and law clearly favor the moving party"); *Martin v. Int'l Olympic Comm.*, 740 F.2d 670, 675 (9th Cir. 1984) ("[C]ourts should be extremely cautious about issuing [such] a preliminary injunction.").

[4] Plaintiffs' motion requests a "preliminary and permanent injunction" but the proposed order only seeks preliminary relief. Plaintiffs obviously cannot establish "actual success" on the merits, as required for a permanent injunction. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 32 (2008).

2

activities, even those involving competitors, often benefit competition, and are therefore not subject to *per se* treatment. *See Dagher*, 547 U.S. at 8 (holding that "pricing decisions of a legitimate joint venture do not fall within the narrow category of activity that is *per se* unlawful under § 1 of the Sherman Act").[5] "Antitrust law doesn't frown on all joint ventures among competitors—far from it." *Freeman v. San Diego Ass'n of Realtors*, 322 F.3d 1133, 1157 (9th Cir. 2003). Rather, "[w]hen a plaintiff challenges the joint venture itself, the venture must be judged under the rule of reason standard." *In re ATM Fee Antitrust Litig.*, 554 F. Supp. 2d 1003, 1012 (N.D. Cal. 2008).

Plaintiffs do not come close to showing that either the LIBOR-setting process or the use of LIBOR as a reference rate is anticompetitive in any respect, much less "plainly" anticompetitive, lacking "any redeeming virtue," and thus subject to *per se* treatment. LIBOR is designed to produce an average rate that is representative of the rates at which certain large, internationally active banks believe they could fund themselves for specific periods as of a specific date.[6] Financial contracts with variable interest rates typically calculate interest at a positive or negative spread to a chosen benchmark, such as LIBOR or the Prime rate; interest payments then vary based on changes to the benchmark rate over time. *See* Cremieux ¶¶ 35–37; Brown ¶¶ 48–52. Benchmarks are generally viewed as procompetitive because they reduce transaction costs and increase price transparency, enabling market participants to more efficiently compete on terms such as the spread or other costs. *See* Cremieux ¶¶ 20–24; Brown ¶ 52. Plaintiffs cannot meet their burden to show that LIBOR is *per se* unlawful with conclusory assertions of "price fixing" and speculation that but for LIBOR, Defendants would "offer[] lower interest rates" and "better and more innovative services." Mot. at 7. And, to the extent Plaintiffs claim that LIBOR is *per se* unlawful because it is set using a "trim average" (*id.* at 1) that excludes the highest and lowest submissions, that assertion is unsupported and misguided. Trimming is commonly used to avoid distortions based on outlier data points; in fact, without trimming, LIBOR would more often than not be set at a *higher* rate. *See* Cremieux ¶¶ 25–

---

[5] *See also In re German Auto. Mfrs. Antitrust Litig.*, 2020 WL 1542373, at *5–6 (N.D. Cal. Mar. 31, 2020) ("[*P*]er se treatment is inappropriate for joint ventures and standard setting."); Ex. 2 (Oct. 1, 2020 Letter from Asst. Att'y Gen. Makan Delrahim (reflecting the U.S. Department of Justice ("DOJ") Antitrust Division's analysis of efforts to prepare for LIBOR's discontinuation under rule of reason and determination not to challenge such efforts)).

[6] *See* Ex. 3 (ICE Benchmark Administration, *ICE LIBOR Methodology*).

32, 49–53.

*United States v. Socony-Vacuum Oil Co.*, which addressed a private agreement among oil companies to eliminate competition by allocating orders among themselves in order to stabilize prices, is plainly inapposite. 310 U.S. 150, 167–68 (1940). Defendants' participation in the LIBOR-setting process, by contrast, is highly regulated, publicly transparent, does not restrain any competition among the participants, and does not stabilize any prices, but instead results only in a published benchmark rate that market participants can independently decide whether to incorporate into their contracts. Nor can Plaintiffs rely on *Gelboim v. Bank of America Corp.*, which involved an alleged conspiracy to suppress LIBOR during the global financial crisis. 823 F.3d 759, 766–67 (2d Cir. 2016). In holding that plaintiffs stated a viable claim, the Second Circuit explained: "The Banks were indeed engaged in a joint process, and that endeavor was governed by rules put in place to prevent collusion. But *the crucial allegation* is that the Banks circumvented the LIBOR-setting rules, and that joint process thus turned into collusion." *Id.* at 775. Here, anything like that "crucial allegation" is missing. Rather than alleging that Defendants "circumvented the LIBOR-setting rules," Plaintiffs allege that Defendants *follow* the rules and that the rules *themselves* are *per se* unlawful. No court or regulator has ever endorsed such a misguided theory.

Plaintiffs also vaguely argue that "LIBOR is the interest rate that all the participating Defendant Banks agree to charge" (Mot. at 2–3) and that each bank "has agreed in writing to adhere to the LIBOR Code of Conduct which requires each Bank to use LIBOR as a base rate." *Id.* at 6. There is no evidence for these unfounded—and incorrect—assertions. The Code of Conduct contains no requirement to "use LIBOR as a base rate." *See* Ex. 4 (ICE LIBOR Code of Conduct). Nor have Plaintiffs presented any evidence (or even plausible allegations) that Defendants have agreed amongst each other to base consumer loans (or any other transactions) on LIBOR. In fact, the vast majority of the consumer loans on which Plaintiffs' expert focuses do not reference LIBOR (*see* Brown ¶¶ 48–50), and the sole alleged transaction between any Plaintiff and Defendant is ***not*** LIBOR-based.[7]

Plaintiffs have not even attempted to plead a rule of reason claim, and for good reason.

---

[7] Plaintiff Yvonne Jocelyn Gardner alleges she obtained a "variable interest rate mortgage from Defendant Bank of America" (Compl. ¶ 6), but in fact obtained a fixed-rate mortgage that nowhere references LIBOR. *See* Exhibit A to Decl. of Paul S. Mishkin.

Among other things, doing so would require Plaintiffs to plead "that the restraint produces significant anticompetitive effects within a relevant market." *O'Bannon v. Nat'l Collegiate Athletic Ass'n*, 802 F.3d 1049, 1070 (9th Cir. 2015). Here, other than a conclusory allegation of unspecified "impact" to an undefined "market for LIBOR-based consumer loans and credit cards," Compl. ¶ 73, the Complaint contains no such allegations. Nor have Plaintiffs shown any injury to competition or any basis to suggest that the LIBOR-setting process is distorted in any respect. *See, e.g.*, *Hip Hop Beverage Corp. v. Monster Energy Co.*, 2016 WL 7324091, at *4 (C.D. Cal. Oct. 26, 2016), *aff'd*, 733 F. App'x 380 (9th Cir. 2018) (dismissing rule of reason claim that raised "conclusory allegations of injury to competition, but [did] not plead specific facts of a cognizable antitrust injury"). Accordingly, Plaintiffs have no likelihood of success on their Section 1 claim.[8]

### B. Plaintiffs Lack Standing To Assert Antitrust Claims

Injunctive relief should also be denied because Plaintiffs both lack Article III standing and fail to satisfy the more demanding standing requirements applicable to antitrust claims.

First, to have Article III standing, "[t]he plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). To obtain a preliminary injunction, Plaintiffs "must make a clear showing of each element of standing." *Yazzie v. Hobbs*, 977 F.3d 964, 966 (9th Cir. 2020). Plaintiffs have not done so here.

Plaintiffs offer no plausible allegations that they were actually injured or that any injury is fairly traceable to LIBOR. While Plaintiffs allege that they have been borrowers under loans with "variable" interest rates (Compl. ¶ 4), there are no allegations, let alone evidence, that these unspecified loans calculated interest *based on LIBOR*, or that Plaintiffs incurred or paid such interest (*e.g.*, by carrying a balance on the credit cards certain Plaintiffs allege, *see* Compl. ¶ 3).

---

[8] Plaintiffs do not seek a preliminary injunction on the basis of their Sherman Act Section 2 claim, so the Court need not consider that claim. In any case, it has no likelihood of success. Among other deficiencies, Plaintiffs fail to "allege facts indicating that a conspiracy exists to create *a monopoly in a single entity*." *Lenhoff Enters., Inc. v. United Talent Agency, Inc.*, 2015 WL 7008185, at *4 (C.D. Cal. Sept. 18, 2015). Plaintiffs' allegations of horizontal conspiracy among competitors solely implicate Section 1, not Section 2, by definition. *See Fed. Trade Comm'n v. Qualcomm Inc.*, 969 F.3d 974, 989–90 (9th Cir. 2020). Also entirely absent are any allegations that Defendants acted with *intent* for one entity to obtain monopoly market power or to engage in any other monopolizing conduct.

Nor are there any allegations or evidence suggesting that Plaintiffs would have obtained more favorable interest rates had their loans referenced a different benchmark. The interest rate on a variable-rate loan consists of a benchmark plus a spread (*e.g.*, LIBOR or Prime plus 2%). While Plaintiffs' expert asserts that LIBOR has been higher than top-grade commercial paper and Treasury rates (Plonsker Decl. ¶¶ 8–25), she ignores important differences between her comparators, not the least of which is credit quality of the panel banks, and does not even attempt to show that but for LIBOR, consumer loans would have referenced those specific benchmarks, or that any hypothetical variable interest rate would have been lower than any actual LIBOR-based rate. *See* Cremieux ¶¶ 45–48; Brown ¶¶ 41–47; *see also* Defs.' Mot. to Strike Plonsker Decl. Plaintiffs' claimed injuries are thus wholly unsupported and speculative. *See Gerlinger v. Amazon.com Inc.*, 526 F.3d 1253, 1254 (9th Cir. 2008) ("plaintiff lacks standing because he did not show that he ever purchased an item for a higher price than he would have [otherwise] paid . . . and thus has suffered no injury-in-fact"); *Jones v. Micron Tech.*, 400 F. Supp. 3d 897, 908 (N.D. Cal. 2019) ("nebulous" allegations of impact "failed to meet the traceability threshold").

Second, Plaintiffs must also satisfy "the more demanding standard for *antitrust* standing." *Lucas Auto. Eng'g v. Bridgestone/Firestone, Inc.*, 140 F.3d 1228, 1232 (9th Cir. 1998) (emphasis in original). Where injunctive relief is at issue, courts balance: "(1) the nature of plaintiffs' injuries and whether plaintiffs were participants in the relevant markets; (2) the directness of the alleged injury; and (3) the speculative nature of the alleged harm." *Los Gatos Mercantile, Inc. v. E.I. DuPont De Nemours & Co.*, 2015 WL 4755335, at *16 (N.D. Cal. Aug. 11, 2015). Each factor cuts against Plaintiffs. Plaintiffs offer no evidence that any Plaintiff suffered any injury at all, let alone a direct, non-speculative injury in a relevant market as a result of Defendants' conduct. None of the 27 Plaintiffs alleges transactions in LIBOR-based instruments. *See 7 W. 57th St. Realty Co., LLC v. Citigroup, Inc.*, 771 F. App'x 498, 502–03 (2d Cir. 2019) (no antitrust standing where plaintiff's claimed transactions "were not actually tied to LIBOR"). No specific transactions of any kind are alleged as to seventeen Plaintiffs, and all but one of the remaining Plaintiffs allegedly transacted with third parties, in which case "significant intervening causative factors, most notably, the independent pricing decisions of non-conspiring [counterparties], attenuate the causal

connection between the violation and the injury." *In re LIBOR–Based Fin. Instruments Antitrust Litig.*, 2016 WL 7378980, at *15–16 (S.D.N.Y. Dec. 20, 2016) ("*LIBOR VI*") (plaintiffs alleging transactions in LIBOR-based products with third parties lacked standing).

Even had Plaintiffs alleged a direct and non-speculative injury in a relevant market, Plaintiffs offer no evidence that any such injury stems from *anticompetitive* harm. Plaintiffs do not allege that LIBOR was based on false or improperly calculated submissions.[9] Nor do Plaintiffs offer any evidence that (1) Defendants agreed to price interest rates on loans or credit cards based on LIBOR (indeed, Plaintiffs' failure to allege any transactions based on LIBOR with any Defendant evidences the absence of such an agreement) or (2) Defendants conspired to limit competition in determining the terms of any LIBOR-based instruments, such as the spreads above the LIBOR benchmark. Plaintiffs thus remained free to contract to pay any interest rate, above or below LIBOR or any other benchmark, without any impediment from Defendants. *See R.C. Dick Geothermal Corp. v. Thermogenics, Inc.*, 890 F.2d 139, 153 (9th Cir. 1989) (en banc) (no antitrust standing where "no injury to competition in either relevant market was shown").

C.    **LIBOR's Comprehensive Regulatory Regime Conflicts With Plaintiffs' Allegations And The Injunctive Relief They Seek**

The comprehensive regulatory regime that governs LIBOR further disproves Plaintiffs' contention that the LIBOR-setting process is an illegal, ongoing conspiracy. *See* Compl. ¶¶ 34–35 (discussing "hand[ing] over administration of LIBOR to UK regulators"). Starting in June 2012, authorities around the world announced a series of resolutions of investigations into alleged manipulation of LIBOR. No regulatory authority suggested, following these extensive investigations into LIBOR, that the LIBOR-setting process was itself *per se* anticompetitive. Instead, certain entities and individuals faced sanctions for *failing to follow* the kinds of LIBOR-setting rules Plaintiffs challenge here.

---

[9] Notably, the lawsuits concerning alleged LIBOR manipulation pending within the Second Circuit principally claim that LIBOR was set *too low*. *See, e.g.*, *In re ICE LIBOR Antitrust Litig.*, 2020 WL 1467354, at *2 (S.D.N.Y. Mar. 26, 2020); *LIBOR VI*, 2016 WL 7378980, at *7. Plaintiffs, as borrowers, would have *benefited* from lower rates, and there is no injury "if the plaintiff stands to gain from the alleged unlawful conduct." *Reveal Chat Holdco, LLC v. Facebook, Inc.*, 2020 WL 3969064, at *9 (N.D. Cal. July 8, 2020).

At the same time, after extensive study by financial regulators, the regulatory regime governing LIBOR was overhauled. The U.K. Parliament passed the Financial Services Act of 2012, which created the Financial Conduct Authority ("FCA") and vested it with broad power to regulate LIBOR and supervise both LIBOR submitters and its administrator.[10] The new regulations require LIBOR's authorized administrator, currently ICE Benchmark Administration Limited ("IBA"), to, among other things, conduct surveillance to monitor and validate submitted rates, identify and manage conflicts of interest, comply with strict requirements in relation to the submission process—including developing a code of conduct for submitters—and commission external audits regarding compliance with the applicable regulations.[11] IBA must also maintain a "LIBOR Oversight Committee," which includes observers from the Federal Reserve, Bank of England, and the Swiss National Bank, to ensure oversight of all aspects of the publication of LIBOR. Compl. ¶¶ 54–56. It belies belief to suggest that this highly regulated process constitutes an ongoing antitrust conspiracy.

Even putting aside the inherent implausibility of Plaintiffs' allegations and lack of supporting evidence, courts are reluctant to allow private antitrust suits to proceed where the conduct at issue is already subject to pervasive regulatory oversight.[12] Here, concerns of international comity require deference to the FCA's regulatory authority over the setting of LIBOR. *See, e.g.*, *Mujica v. AirScan Inc.*, 771 F.3d 580, 605–06 (9th Cir. 2014) (cautioning against "unintended clashes between our laws and those of other nations"); *Kiobel v. Royal Dutch Petrol.*

---

[10] *See* Ex. 5 (Financial Services Act of 2012, c. 21 §§ 7, 91 (Eng.)). The FCA's authority was further strengthened with the passage of the European Commission's Benchmarks Regulation ("BMR"), under which LIBOR is currently regulated, which designates LIBOR as a "critical benchmark." *See* Exs. 6–7 (Regulation (EU) 2016/1011 (June 8, 2016)); Regulation (EU) 2017/2446 (Dec. 19, 2017)).

[11] Ex. 8 (FCA, Annual Report 2013/14 at 37 (July 10, 2014); *see also* Ex. 9 (IBA, ICE LIBOR Benchmark Statement (updated July, 8, 2020)); Ex. 10 (FCA, Market Conduct Handbook, MAR ¶¶ 8.1–8.3 (July 9, 2013)); Ex. 11 (FCA, Market Conduct Handbook, MAR § 8 (Oct. 2020); Ex. 4 (IBA, LIBOR Code of Conduct Issue 7 at 14–23 (detailing comprehensive governance and control requirements)).

[12] *See Credit Suisse Sec. (USA) LLC v. Billing*, 551 U.S. 264, 277, 283–84 (2007) (rejecting antitrust claim where agency exercised ongoing regulatory authority resulting in "diminished need for antitrust enforcement"); *Verizon Commc'ns, Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 412 (2004) (Where a regulatory structure designed to detect and deter anticompetitive harm exists, "the additional benefit to competition provided by antitrust enforcement will tend to be small, and it will be less plausible that the antitrust laws contemplate such additional scrutiny.").

Co., 569 U.S. 108, 121 (2013) (same). Indeed, the U.K. and European legislatures considered LIBOR so central to the economy that they empowered the FCA to compel banks to make LIBOR submissions and to require IBA to administer LIBOR.[13] Plaintiffs' injunction would directly intrude on the FCA's authority, flouting the deference to foreign law that comity demands.[14]

The court overseeing the longstanding LIBOR multi-district litigation has recognized the significance of such concerns. *See In re LIBOR–Based Fin. Instruments. Antitrust Litig.*, 2015 WL 6243526, at *107 (S.D.N.Y. Oct. 20, 2015). When presented with requests for injunctive relief, the court dismissed plaintiffs' concerns about ongoing misconduct related to LIBOR as "conjectural and hypothetical." *Id.* And the court also explained that "[i]njunctive relief is especially inappropriate" because U.S. courts should not "interfere with the United Kingdom's regulation" of LIBOR. *Id.* at *108 ("[C]ourts must use the most drastic remedies with great caution, and must consider issues of international comity."). This Court should likewise deny Plaintiffs' motion.

### D. <u>Plaintiffs Fail To Demonstrate Personal Jurisdiction Over Defendants</u>

Finally, Plaintiffs are unlikely to succeed on the merits because they present no proof, as is their burden, that this Court has personal jurisdiction over Defendants.[15]

Personal jurisdiction may be general (all-purpose) or specific (conduct-linked). *Panavision Int'l, L.P. v. Toeppen*, 141 F.3d 1316, 1320 (9th Cir. 1998). Plaintiffs do not—and cannot—show that any Defendant is subject to general jurisdiction because none is incorporated or has its principal place of business in California. *Martinez v. Aero Caribbean*, 764 F.3d 1062, 1070 (9th Cir. 2014); *See* Exs. 30–52 (declarations of Defendants). Nor is this an "exceptional case" that otherwise supports general jurisdiction. *See Daimler AG v. Bauman*, 571 U.S. 117, 139 n.19 (2014).

Plaintiffs have also not demonstrated that any Defendant is subject to specific jurisdiction. Jurisdiction must be based on defendants' own "suit-related conduct" creating a "substantial

---

[13] *See* Ex. 11, (MAR § 8.7.3); Ex. 12 (FCA, PS 18/5: Powers in Relation to LIBOR Contributions, 1, 10 (Mar. 2018); Ex. 6 (BMR arts. 21, 23).

[14] *See In re Vitamin C Antitrust Litig.*, 837 F.3d 175, 194 (2d Cir. 2016) (U.S. antitrust claims should not proceed where foreign law or regulations mandate the challenged conduct), *vacated and remanded on other grounds by Animal Science Prods., Inc. v. Hebei Welcome Pharm. Co.*, 138 S. Ct. 1865, 1869, 1873–75 (2018).

[15] Plaintiffs have not yet even properly served many Defendants. Defendants expressly preserve all defenses based on lack of personal jurisdiction and insufficiency of service.

connection with the forum State," not conduct involving third parties. *Walden v. Fiore*, 571 U.S. 277, 284 (2014); *Picot v. Weston*, 780 F.3d 1206, 1214 (9th Cir. 2015). To be jurisdictionally relevant, such conduct must also be the "very activity" out of which the "cause of action arises." *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 780 (1984). But the LIBOR-setting process occurs entirely outside the U.S.[16] *See* Exs. 27–41 (declarations of LIBOR panel banks). Plaintiffs' claims arise from that process, not from LIBOR-based loans made by Defendants, and in any event, there is no causal connection between individual consumer lending transactions and setting LIBOR. *See Charles Schwab Corp. v. Bank of Am. Corp.*, 883 F.3d 68, 83–84 (2d Cir. 2018) (in-forum transactions with defendants in LIBOR-linked instruments did not establish jurisdiction because they "did not cause [d]efendants' false LIBOR submissions to the BBA in London, nor did the transactions in some other way give rise to claims seeking to hold [d]efendants liable for those submissions"). Indeed, with one irrelevant exception (*see supra* note 7), Plaintiffs did not even transact with any Defendant. As to certain Defendants, Plaintiffs cannot even demonstrate that such Defendants issued consumer loans in the U.S. *See* Exs. 30, 37, 49–51 (declarations of Defendants). And while Plaintiffs have cited *Go-Video, Inc. v. Akai Elec. Co., Ltd.*, 885 F.2d 1406 (9th Cir. 1989) as support, Case Mgmt. Stmt. at 9 (ECF 56), there the alleged conspiracy was furthered in the U.S. Here, the jurisdictionally relevant conduct—*i.e.*, the submission process and administration and determination of LIBOR—occurred outside the U.S., and thus does not support jurisdiction. *See Bright Lite Structures, LLC v. Balform, Ltd.*, 2020 WL 2218967, at *9 (N.D. Cal. May 7, 2020).

## III.    PLAINTIFFS WILL SUFFER NO IRREPARABLE HARM

Plaintiffs cannot demonstrate any irreparable harm. The only harm Plaintiffs purport to allege is that they have paid, or may pay, interest rates that are higher than the rates they hypothetically would pay if LIBOR did not exist. *See* Mot. at 11 (citing Plonsker Decl. ¶¶ 32–34) (purporting to be able to quantify damages). In other words, their purported injury is limited to money damages, which is not irreparable injury and not a basis for a preliminary injunction. *See*

---

[16] Whether the appropriate forum for purposes of specific jurisdiction is the U.S. or California is irrelevant because Plaintiffs' claims fail under either analysis. In any event, *Daimler*'s focus on fundamental fairness forecloses a nationwide contacts test. 571 U.S. at 138–39.

*Brown v. United States*, 951 F.2d 358 n.4 (9th Cir. 1991) (Table) ("mere monetary harm or financial hardship does not constitute irreparable injury"). Plaintiffs "offer[] no hint whatsoever as to why money damages cannot adequately compensate Plaintiff[s]," so there is no irreparable harm. *Avila-Martinez v. Wells Fargo Bank, N.A.*, 2011 WL 3876000, at *2 (E.D. Cal. Aug. 31, 2011).

In addition, Plaintiffs' delay in bringing this motion is fatal to their claim of irreparable harm. This lawsuit is not based on newly discovered information and was not filed in response to an impending change in the status quo. To the contrary, Plaintiffs allege that Defendants have engaged in a "blatant, open and notorious conspiracy" conducted in full public view ever since LIBOR was introduced over 30 years ago. Mot. at 15; *see also* Compl. ¶¶ 30–66. Where the challenged conduct "has been occurring continually and without interruption for years" prior to a lawsuit or request for an injunction, "[t]hat delay alone is sufficient to undermine Plaintiff's claim of immediate, irreparable harm." *Protech Diamond Tools, Inc. v. Liao*, 2009 WL 1626587, at *6 (N.D. Cal. June 8, 2009).[17] Nor do Plaintiffs—who merely claim to be "actual or potential borrower[s]" of variable-rate consumer loans (Mot. at 11)—allege any change in their own circumstances that would result in some novel harm to them.

Plaintiffs cite *Rent-A-Center, Inc. v. Canyon Television & Appliance Rental, Inc.*, which holds that "intangible injuries, such as damages to ongoing recruitment efforts and goodwill, qualify as irreparable harm." 944 F.2d 597, 603 (9th Cir. 1991). But Plaintiffs here allege no intangible injuries or other extraordinary circumstances. Vague claims that Plaintiffs are being "deprived of the benefits of free and open competition" (Mot. at 11) are not remotely sufficient: a mere allegation of an "injury to competition" does not "bear[] the immediacy and permanence necessary for a finding of irreparable injury." *Reilly v. Medianews Grp., Inc.*, 2006 WL 2419100, at *6 (N.D. Cal. July 28, 2006).

---

[17] *See also Open Text, S.A. v. Box, Inc.*, 36 F. Supp. 3d 885, 908–09 (N.D. Cal. 2014) (delay in filing motion for preliminary injunction undercuts finding of irreparable harm); *Innospan Corp. v. Intuit, Inc.*, 2010 WL 5157157, at *2 (N.D. Cal. Dec. 3, 2010) (denying motion where plaintiff waited "over three years" to sue "and did not request preliminary relief until over a month after filing suit"); *Brunnen v. Mission Ranch*, 1998 WL 34032533, at *2 (N.D. Cal. Nov. 24, 1998) (one-year delay shows "there is not a threat of irreparable injury"). Here also, Plaintiffs waited approximately three months to file their motion after filing suit.

# IV. THE BALANCE OF EQUITIES TIPS STRONGLY AGAINST PLAINTIFFS

Plaintiffs also cannot show that any likely harm absent an injunction outweighs the likely harm to Defendants if the injunction were granted, much less that this balance "tips sharply in [their] favor." *United Nat'l Maint., Inc. v. San Diego Convention Ctr. Corp., Inc.*, 2008 WL 11333629, at *2 (S.D. Cal. Feb. 19, 2008); *see also La Clinica De La Raza, Inc. v. Cal. Dep't of Health Care Servs.*, 2015 WL 5315964, at *4–5 (N.D. Cal. Sept. 11, 2015) (denying preliminary injunction where harm to defendant, even though modest, outweighed harm claimed by plaintiff).

Plaintiffs not only fail to identify any harm they would suffer absent the requested injunction, they also fail to show how the injunction would benefit them. Plaintiffs seek to enjoin Defendants from "enforcing any variable interest-rate consumer loan or credit tied to LIBOR" or other "financial instrument that relies in whole or in part on USD LIBOR." [Proposed] Order ¶¶ (iv), (vi). But Plaintiffs allege only a single transaction between one Plaintiff and one Defendant, which in turn involves a fixed-rate loan, ***not*** linked to LIBOR, that would not be impacted by the injunction. *See Perfect 10, Inc. v. Google, Inc.*, 653 F.3d 976, 981 (9th Cir. 2011) (affirming denial of injunction where plaintiff had "not established that the requested injunction would forestall" the perceived harm); *cf. Charles Schwab*, 883 F.3d at 83–84 (affirming dismissal of fraud claims premised on alleged impact of LIBOR manipulation on transactions in fixed-rated instruments). The harm to Defendants from enjoining the enforcement of any LIBOR-based contract, on the other hand, would be catastrophic: untold numbers of financial instruments would be rendered unenforceable, which would trigger massive financial losses and a wave of follow-on litigation.

Abruptly enjoining Defendants from "continuing to set or observe LIBOR" ([Proposed] Order ¶ (iv)) would also massively disrupt global financial markets, causing grave uncertainty regarding rights and obligations under contracts that reference LIBOR. For years, Defendants and hundreds of other market participants have been working closely with global financial regulators to carefully prepare markets for a transition away from LIBOR to other benchmarks to avoid precisely the disruption to financial markets that Plaintiffs' proposed abrupt discontinuation of LIBOR would cause.[18] This careful and deliberate process would be frustrated, and financial

---

[18] *See, e.g.*, Ex. 13 (Press Release, European Comm'n, *Financial stability: Commission addresses risks of Libor cessation* (July 24, 2020)) ("If a critical benchmark ceases to be published, thousands

markets would be plunged into turmoil, if LIBOR were suddenly enjoined now. Enjoining LIBOR would also undermine existing agreements between the panel bank Defendants and the FCA, as well as IBA's regulated administrator role. LIBOR panel members have agreed with the FCA to continue to make daily submissions for the calculation of LIBOR until the end of 2021.[19] The FCA sought those agreements "to enable time for the market to transition away from LIBOR"[20] so that "counterparties and holders of contracts in which payments are determined by reference to LIBOR rates" are not left without an "agreed means of determining those payments."[21] Plaintiffs' injunction would contravene these express directives and regulatory agreements.

The balance of equities thus clearly favors Defendants. Plaintiffs identify no harm they would suffer in the absence of an injunction. *See, e.g.*, *Blind Doctor Inc. v. Hunter Douglas, Inc.*, 2004 WL 1976562, at *9 (N.D. Cal. Sept. 7, 2004). In contrast, the injunction would be hugely detrimental to Defendants. Unlike most preliminary injunctions that *preserve* the status quo in the face of imminent change, Plaintiffs' proposed preliminary injunction would wreak havoc on Defendants' businesses, as well as their contractual and regulatory obligations. Such an injunction is "particularly disfavored," is not in accord with the purpose of preliminary injunctive relief, and is not appropriate here. *Marilyn Nutraceuticals*, 571 F.3d at 879; *see also Sierra On-Line*, 739 F.2d at 1422 (preliminary injunction is "not a preliminary adjudication on the merits").[22]

---

of contracts existing at the date of cessation can be disrupted and could, ultimately, threaten financial stability."); Ex. 14 (Fed. Reserve Bank of Atlanta, *LIBOR Transition–Ready or Not?* (Feb. 6, 2020)) ("The transition from LIBOR to other benchmarks is complex and challenging and, if not handled appropriately, puts the stability of the financial system at risk[.]").

[19] *See* Ex. 15 (Jerome Powell & J. Christopher Giancarlo, *How to Fix Libor Pains: The time has come to phase in an alternative to the interest-rate benchmark,* Wall St. Journal (Aug. 3, 2017)), (noting with approval that "[t]he FCA has brokered agreements with banks to continue submitting rates until the end of 2021, at which point a new benchmark is expected to take its place.").

[20] *See* Ex. 16 (FCA, *Transition from LIBOR* (Apr. 9, 2019)).

[21] Ex. 17 (Andrew Bailey, Chief Executive, Financial Conduct Authority, Speech at Bloomberg London: The future of LIBOR (July 27, 2017).)

[22] Plaintiffs argue they should not be required to post a bond. Mot. at 14–15. But the fact that Plaintiffs clearly could not post any remotely adequate bond only underscores that the requested injunction should not issue due to the wildly disparate harm to Defendants that would result. *See Healthy Harvest Berries, Inc. v. Rodriguez*, 2014 WL 975321, at *3 (E.D. Cal. Mar. 12, 2014) ("[T]he greater the potential the preliminary injunction has to harm Defendants' business, the greater the amount of the security bond must be." (citing Fed. R. Civ. P. 65(c))).

---

13

## V. PLAINTIFFS' INJUNCTION WOULD DISSERVE THE PUBLIC INTEREST

"The public interest inquiry primarily addresses impact on non-parties rather than parties," *Sammartano v. First Judicial Dist. Court*, 303 F.3d 959, 974 (9th Cir. 2002), and is particularly relevant where, as here, the "injunction reaches beyond the parties, carrying with it a potential for public consequences." *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1138–39 (9th Cir. 2009)).

In this case, public interest considerations strongly disfavor entry of Plaintiffs' injunction, which would harm millions of non-parties around the globe. Plaintiffs seek to enjoin "any agreement or contract for a variable interest rate consumer loan that includes USD LIBOR as a component of its variable interest rate" (Mot. at 15), but fail to even address the consequences of that action for the millions of credit cards, mortgages, and other financial instruments that would fall within this category, or to consider the harm to Defendants' non-party customers and clients, who could suffer from the loss of access to credit as a result of the unexpected cancellation or suspension of their contracts. The relief Plaintiffs seek thus contravenes the Ninth Circuit's directive that "[i]njunctive relief . . . must be tailored to remedy the *specific harm alleged*." *Park Village Apt. Tenants Ass'n v. Mortimer Howard Trust*, 636 F.3d 1150, 1160 (9th Cir. 2011) (emphasis in original); *see also Young v. Third & Mission Assocs., LLC*, 2014 WL 4382997, at *4 (N.D. Cal. Sept. 4, 2014) (denying motion where "the preliminary injunction sought is massively overbroad, seeking, *inter alia*, to enjoin a non-party").

The public interest in avoiding an abrupt and disorderly discontinuation of LIBOR is well documented, given that global financial institutions and regulators have spent years carefully considering how to accomplish a non-disruptive transition to one or more alternative benchmarks by the end of 2021 and have consistently apprised the public of those efforts. For example:

- The Chief Executive of the FCA has stated that the world could not "countenance the market disruption that would be caused by an unexpected and unplanned disappearance of LIBOR."[23]

- The chairman of the Federal Reserve has "publicly supported the FCA's efforts to secure an agreement with the submitting banks to stay on through the end of 2021," and has "encouraged the U.S. banks that submit to LIBOR to cooperate with FCA's effort."[24]

- The Senior Vice President of the Federal Reserve Bank of New York described the transition

---

[23] Ex. 17 (*The future of LIBOR*, *supra* note 21).

[24] Ex. 18 (Jerome Powell, Introductory Remarks at the Roundtable of the ARRC (Nov. 2, 2017)).

away from LIBOR after 2021 as "arguably one of the most significant and complex challenges that financial markets will ever confront," which has involved "years of preparation, thoughtful consideration, and countless conversations to reach this point."[25]

- The chairs of the Federal Reserve Board and Commodity Futures Trading Commission ("CFTC") authored an article stating that "a stable financial system requires a stable reference interest rate. There is time for this transition [away from LIBOR] to be done thoughtfully."[26]

- The Alternative Reference Rates Committee ("ARRC"), a group of market participants convened by the Federal Reserve to help ensure a successful transition from LIBOR to more robust reference rates, has explained that "[b]ecause U.S. dollar (USD) LIBOR is used in such a large volume and broad range of financial products and contracts, the risks surrounding it pose a potential threat to the safety and soundness of individual financial institutions and to financial stability. Without advanced preparation, a sudden cessation of such a heavily used reference rate would cause considerable disruptions to and uncertainties around the large gross flows of USD LIBOR-related payments and receipts between many firms. It would also impair the normal functioning of a variety of markets, including business and consumer lending."[27]

- The SEC's Office of Compliance Inspections and Examinations has stressed that "[p]reparation for the transition away from LIBOR is essential for minimizing any potential adverse effects associated with LIBOR discontinuation," and that "[t]he risks associated with this discontinuation and transition will be exacerbated if the work necessary to effect an orderly transition to an alternative reference rate is not completed in a timely manner."[28]

Additional commentary from regulators regarding the significant economic risks presented by an abrupt and disorderly cessation of LIBOR is compiled in Exhibits 21–24. Section IV of Dr. Brown's Report also contains a detailed discussion of the negative consequences to world financial markets of an injunction against the LIBOR-setting process. *See* Brown ¶¶ 15–37.

Plaintiffs wholly fail to address these issues. They instead speculate, without support, that the abrupt cessation of LIBOR would lower consumer interest rates and argue that the public has an interest in enforcement of the antitrust laws. But that is wholly deficient, and "[t]he current legal landscape cautions against preliminarily finding antitrust violations based on less than a full record." *Epic Games, Inc. v. Apple Inc.*, 2020 WL 5993222, at *6 (N.D. Cal. Oct. 9, 2020). Plaintiffs do not come remotely close to showing entitlement to the calamitous relief they seek.

## VI. CONCLUSION

For all of the foregoing reasons, Plaintiffs' motion should be denied.

---

[25] Ex. 1 (*Transitioning Away From LIBOR*, *supra* note 2).

[26] Ex. 15 (Powell & Giancarlo, *How to Fix Libor Pains*, *supra* note 19).

[27] Ex. 19 (ARRC, *Second Report*, at 1 (Mar. 2018)).

[28] Ex. 20 (SEC, *Examination Initiative: LIBOR Transition Preparedness* (June 18, 2020)).

Dated:  November 24, 2020

Respectfully submitted,

| | |
|---|---|
| *Harrison J. (Buzz) Frahn IV* | */s/ Adam S. Hakki* |
| Harrison J. (Buzz) Frahn IV (SBN 206822) | Adam S. Hakki (*pro hac vice*) |
| SIMPSON THACHER & BARTLETT LLP | Jerome S. Fortinsky (*pro hac vice*) |
| 2475 Hanover Street | SHEARMAN & STERLING LLP |
| Palo Alto, California 94304 | 599 Lexington Ave |
| Telephone: (650) 251-5000 | New York, New York 10022 |
| hfrahn@stblaw.com | Telephone: (212) 848-4000 |
| | ahakki@shearman.com |
| | jfortinsky@shearman.com |
| Paul C. Gluckow (*pro hac vice*) | |
| Alan Turner (*pro hac vice*) | |
| SIMPSON THACHER & BARTLETT LLP | John F. Cove Jr.  (SBN 212213) |
| 425 Lexington Avenue | SHEARMAN & STERLING LLP |
| New York, New York 10017 | 535 Mission Street, 25th Floor |
| Telephone: (212) 455-2000 | San Francisco, CA 94105-2997 |
| pgluckow@stblaw.com | Telephone: (415) 616-1139 |
| aturner@stblaw.com | john.cove@shearman.com |
| | |
| Abram Ellis (*pro hac vice*) | *Counsel for Defendants Intercontinental* |
| SIMPSON THACHER & BARTLETT LLP | *Exchange, Inc., Intercontinental Exchange* |
| 900 G Street, NW | *Holdings, Inc., ICE Data Services, Inc., and* |
| Washington, DC 20001 | *ICE Data Pricing & Reference Data, LLC* |
| Telephone: (202) 636-5500 | |
| aellis@stblaw.com | |

*Counsel for Defendants JPMorgan Chase &*
*Co., JPMorgan Chase Bank, N.A., and*
*J.P.Morgan Securities LLC*

| | |
|---|---|
| */s/ Jeffrey T. Scott* | */s/ George Cary* |
| Jeffrey T. Scott (*pro hac vice*) | George Cary (SBN 73858) |
| Matthew J. Porpora (*pro hac vice*) | CLEARY GOTTLIEB STEEN & |
| SULLIVAN & CROMWELL LLP | HAMILTON LLP |
| 125 Broad Street | 2112 Pennsylvania Avenue, NW |
| New York, New York 10004 | Washington, D.C. 20037-3229 |
| Telephone: (212) 558-4000 | Telephone: (202) 974-1500 |
| Facsimile: (212) 558-3588 | gcary@cgsh.com |
| scottj@sullcrom.com | |
| porporam@sullcrom.com | Lev L. Dassin (*pro hac vice* forthcoming) |
| | Roger A. Cooper (*pro hac vice* forthcoming) |
| Adam S. Paris (SBN 190693) | CLEARY GOTTLIEB STEEN & |
| SULLIVAN & CROMWELL LLP | HAMILTON LLP |
| 1888 Century Park East | One Liberty Plaza |
| Los Angeles, California 90067-1725 | New York, New York 10006 |
| Telephone: (310) 712-6600 | Telephone: (212) 225-2000 |
| Facsimile: (310) 712-8800 | ldassin@cgsh.com |
| parisa@sullcrom.com | racooper@cgsh.com |

| | |
|---|---|
| *Counsel for Defendant Barclays Capital Inc.* | *Counsel for Defendants Citigroup Inc. and* |
| | *Citigroup Global Markets Inc.* |

1    /s/ Joel Kurtzberg

Joel Kurtzberg (*pro hac vice*)
2    Elai Katz (*pro hac vice*)
Herbert S. Washer (*pro hac vice*)
3    Adam S. Mintz (*pro hac vice*)
CAHILL GORDON & REINDEL LLP
4    32 Old Slip
New York, New York 10005
5    Telephone: (212) 701-3000
jkurtzberg@cahill.com
6    ekatz@cahill.com
hwasher@cahill.com
7    amintz@cahill.com

8    Robert H. Bunzel (SBN 99395)
BARTKO, ZANKEL, BUNZEL & MILLER
9    A Professional Corporation
One Embarcadero Center
10   Suite 800
San Francisco, California 94111
11   Telephone: (415) 956-1900
rbunzel@bzbm.com
12
*Counsel for Defendants Credit Suisse AG and*
13   *Credit Suisse Securities (USA) LLC*

14
     /s/ Jenny Pelaez

15   Jenny Pelaez (SBN 326765)
WILMER CUTLER PICKERING
16   HALE AND DORR LLP
350 South Grand Avenue, Suite 2400
17   Los Angeles, CA 90071
Tel.: (213) 443-5300
18   Fax: (213) 443-5400
jenny.pelaez@wilmerhale.com
19
David S. Lesser (*pro hac vice*)
20   Jamie Dycus (*pro hac vice*)
WILMER CUTLER PICKERING
21   HALE AND DORR LLP
7 World Trade Center, 250 Greenwich Street
22   New York, NY 10007
Tel.: (212) 937-7518
23   Fax: (212) 230-8888
david.lesser@wilmerhale.com
24   jamie.dycus@wilmerhale.com

25   *Counsel for Defendant NatWest Markets*
*Securities Inc.*
26

27

28

     /s/ Meredith Dearborn

Meredith Dearborn (SBN 268312)
PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
943 Steiner Street
San Francisco, California 94117
Telephone: (650) 208-2788
mdearborn@paulweiss.com

Brad S. Karp (*pro hac vice* forthcoming)
Jessica S. Carey (*pro hac vice*)
Hallie S. Goldblatt (*pro hac vice*)
PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
1285 Avenue of the Americas
New York, New York 10019
Telephone: (212) 373-3000
bkarp@paulweiss.com
jcarey@paulweiss.com
hgoldblatt@paulweiss.com

*Counsel for Defendants Deutsche Bank AG*
*and Deutsche Bank Securities Inc.*

     /s/ Sverker K. Hogberg

Sverker K. Hogberg (SBN 244640)
SULLIVAN & CROMWELL LLP
1870 Embarcadero Road
Palo Alto, California 94303
Telephone: (650) 461-5600
hogbergs@sullcrom.com

Christopher M. Viapiano (*pro hac vice*)
Elizabeth A. Cassady (*pro hac vice*
forthcoming)
SULLIVAN & CROMWELL LLP
1700 New York Avenue, N.W., Suite 700
Washington, D.C. 20006
Telephone: (202) 956-7500
viapianoc@sullcrom.com
cassadye@sullcrom.com

*Counsel for Defendants MUFG Bank, Ltd.*
*and MUFG Securities Americas Inc.*

*/s/ Jon R. Roellke*

Jon R. Roellke (*pro hac vice*)
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Ave. NW
Washington, DC 20004
Telephone: (202) 739-5754
jon.roellke@morganlewis.com

Geoffrey T. Holtz (SBN 191370)
MORGAN, LEWIS & BOCKIUS LLP
One Market, Spear Street Tower
San Francisco, CA 94105
Telephone: (415) 442-1414
geoffrey.holtz@morganlewis.com

*Counsel for Defendants Sumitomo Mitsui Banking Corporation and SMBC Capital Markets, Inc.*


*/s/ Douglas K. Yatter*

Douglas K. Yatter (SBN 236089)
Richard D. Owens (*pro hac vice*)
Lilia B. Vazova (*pro hac vice*)
LATHAM & WATKINS LLP
885 Third Avenue
New York, New York 10022
Telephone: (212) 906-1200
douglas.yatter@lw.com
richard.owens@lw.com
lilia.vazova@lw.com

Hilary H. Mattis (SBN 271498)
LATHAM & WATKINS LLP
140 Scott Drive
Menlo Park, CA 94025
Telephone: (650) 328-4600
hilary.mattis@lw.com

*Counsel for Defendant RBC Capital Markets, LLC*


*/s/ Micah G. Block*

Micah G. Block (SBN 270712)
DAVIS POLK & WARDWELL LLP
1600 El Camino Real
Menlo Park, California 94025
Telephone: (650) 752-2000
Facsimile: (650) 752-2111
micah.block@davispolk.com

Paul S. Mishkin (*pro hac vice*)
Adam G. Mehes (*pro hac vice*)
DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000
Facsimile: (212) 701-5800
paul.mishkin@davispolk.com
adam.mehes@davispolk.com

*Counsel for Defendants Bank of America Corp. and Bank of America, N.A.*


*/s/ Joshua D. Dick*

Joshua D. Dick (SBN 268853)
GIBSON, DUNN & CRUTCHER LLP
555 Mission Street, Suite 3000
San Francisco, CA 94105-0921
Telephone: (415) 393-8331
jdick@gibsondunn.com

Eric J. Stock (*pro hac vice forthcoming*)
Jefferson E. Bell (*pro hac vice pending*)
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, New York 10166-0193
Telephone: (212) 351-4000
estock@gibsondunn.com
jbell@gibsondunn.com

Nathaniel L. Bach (SBN 246518)
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone: (213) 229-7000
nbach@gibsondunn.com

*Counsel for Defendant UBS Securities LLC*

DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION     CASE NO. 20-CV-05832-JD

*/s/ Lisa Bugni*
_____
Lisa Bugni (SBN 323962)
KING & SPALDING LLP
50 California Street, Suite 3300
San Francisco, CA 94111
Telephone: (415) 318-1200
Facsimile: (415) 318-1300
lbugni@kslaw.com

Damien Marshall (*pro hac vice* forthcoming)
Alvin Lee (*pro hac vice* forthcoming)
Laura Harris (*pro hac vice* forthcoming)
KING & SPALDING LLP
1185 Avenue of the Americas, 34th Floor
New York, NY 10036
Telephone:  (212) 556-2100
Facsimile:  (212) 556-2222
dmarshall@kslaw.com
alvin.lee@kslaw.com
lharris@kslaw.com

*Counsel for Defendants HSBC Bank USA,*
*N.A. and HSBC Securities (USA) Inc.*

*/s/ Paul B. Salvaty*
_____
Paul B. Salvaty (Bar No. 171507)
HOGAN LOVELLS US LLP
1999 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067
Telephone: (310) 785-4600
paul.salvaty@hoganlovells.com

Marc J. Gottridge (*pro hac vice pending*)
Lisa J. Fried (*pro hac vice*)
HOGAN LOVELLS US LLP
390 Madison Avenue
New York, NY 10017
Telephone: (212) 918-3000
marc.gottridge@hoganlovells.com
lisa.fried@hoganlovells.com

*Counsel for Defendant Lloyds Securities Inc.*

## FILER'S ATTESTATION

Pursuant to Civil Local Rule 5-1(i)(3) regarding signatures, Harrison J. (Buzz) Frahn IV hereby attests that concurrence in the filing of the document has been obtained from all the signatories above.

Dated: November 24, 2020

*/s/ Harrison J. (Buzz) Frahn IV*

Harrison J. (Buzz) Frahn IV