MICHAEL HELD (*pro hac vice* pending)
KATHERINE STEELE LANDY (*pro hac vice* pending)
ALEX LEONARD (*pro hac vice* pending)
FEDERAL RESERVE BANK OF NEW YORK
33 Liberty Street
New York, New York  10045
Telephone:  (212) 720-5000
Facsimile:   (212) 720-2252
Email:       michael.held@ny.frb.org
             katherine.landy@ny.frb.org
             alex.leonard@ny.frb.org

JEFFREY S. BOSLEY (CA State Bar No. 167629)
DAVIS WRIGHT TREMAINE LLP
505 Montgomery Street, Suite 800
San Francisco, California  94111-6533
Telephone:  (415) 276-6500
Facsimile:   (415) 276-6599
Email:       jeffbosley@dwt.com

Attorneys for *Amicus Curiae* Federal Reserve Bank of New York

MARK VAN DER WEIDE
RICHARD M. ASHTON
JOSHUA P. CHADWICK
KATHERINE POMEROY
BOARD OF GOVERNORS
OF THE FEDERAL RESERVE SYSTEM
20th Street and Constitution Avenue, N.W.
Washington, DC  20551
Telephone:  (202) 912-4329
Facsimile:   (202) 736-5615
Email:       mark.vanderweide@frb.gov
             rich.ashton@frb.gov
             joshua.p.chadwick@frb.gov
             katherine.pomeroy@frb.gov

Attorneys for *Amicus Curiae* Board of Governors
of the Federal Reserve System

IN THE UNITED STATES DISTRICT COURT

THE NORTHERN DISTRICT OF CALIFORNIA - SAN FRANCISCO DIVISION

| | |
|---|---|
| LISA MCCARTHY, et al.,<br><br>  Plaintiffs,<br><br>  vs.<br><br>INTERCONTINENTAL EXCHANGE INC., et al.,<br><br>  Defendants. | Case No. 3:20-cv-05832-JD<br><br>Assigned to the Hon. James Donato<br><br>***AMICUS CURIAE* BRIEF OF FEDERAL RESERVE BANK OF NEW YORK AND BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM** |

# **TABLE OF CONTENTS**

Page

I. PRELIMINARY STATEMENT ................................................................................................ 1

II. BACKGROUND ........................................................................................................................ 2

III. ARGUMENT .............................................................................................................................. 5

    A. PLAINTIFFS' REQUESTED INJUNCTION WOULD LIKELY DESTABILIZE FINANCIAL MARKETS, POSE A SIGNIFICANT RISK TO FINANCIAL STABILITY, AND BE AGAINST THE PUBLIC INTEREST ............................................................................................................... 5

        1. Freezing or Disrupting the Trading of Financial Contracts ........................ 6

        2. Upending Consumer Contracts, Including Mortgages and Student Loans ............................................................................................................. 7

        3. Impacting the Safety and Soundness of Certain Financial Institutions ..................................................................................................... 7

        4. Undermining Public Confidence in Financial Markets and Creating an Avalanche of Litigation ............................................................................ 8

IV. CONCLUSION ........................................................................................................................... 8

## I.  PRELIMINARY STATEMENT

The U.S. dollar LIBOR benchmark reference rate ("LIBOR") underlies financial products and contracts totaling more than $223 trillion.[1]  It is a widely used reference rate across various financial products including loans, securities, and derivatives.  Its reach extends far beyond financial institutions, and impacts everyday businesses and consumers engaged in activities such as buying homes and financing education.

Plaintiffs in this action have asked this Court to immediately enjoin the publication of LIBOR and void variable interest rate contracts for consumer loans which include LIBOR as a reference rate.[2]  As more fully detailed herein, such an abrupt end to LIBOR without an orderly transition would be detrimental to the public interest with consequences that could include: 1) freezing or disrupting the trading of financial contracts; 2) upending consumer contracts, including mortgages and student loans; 3) negatively impacting the safety and soundness of financial institutions; and 4) undermining public confidence in financial markets and creating an avalanche of litigation.

As the Court is aware, there is currently an international effort to transition away from LIBOR to more robust reference rates.  As part of that transition, the Federal Reserve Bank of New York ("New York Fed") and the Board of Governors of the Federal Reserve System ("Board of Governors"), in partnership with other U.S. and international financial sector authorities, industry organizations, and market participants, have worked to ensure that this transition happens in a planned, orderly, and responsible fashion.  Underlying all these efforts is the broad recognition of the significance of reference rates to the functioning of financial markets

---

[1] *See Progress Report: The Transition from U.S. Dollar LIBOR* at Table 1, Alternative Reference Rates Committee (Mar. 2021), *available at* https://www.newyorkfed.org/medialibrary/Microsites/arrc/files/2021/USD-LIBOR-transition-progress-report-mar-21.pdf.

[2] Pls.' Mot. for Prelim. and Permanent Inj. – Mem. of P. & A. in Supp. at iii (Nov. 10, 2021), ECF No. 19 (hereinafter, "Pls.' Mot.").

and their status as a key component of the global financial infrastructure.[3]

The Board of Governors and New York Fed submit this *amicus* brief to emphasize the adverse effects such an extraordinary injunctive remedy would have on the public interest.[4]  An abrupt end to LIBOR would harm countless nonparties, including Main Street businesses and everyday consumers, and pose a significant threat to global financial markets and to financial stability.  It would also threaten to undo years of global transition planning by financial sector regulators in the United States and abroad and key progress currently underway in the transition.  Importantly, this *amicus* brief addresses only the public interest factor in the standard for seeking a preliminary injunction; it does not take a position on any other issue before the Court.

The Board of Governors and New York Fed respectfully offer their views to the Court as it considers Plaintiffs' motions.[5]  Plaintiffs' motions for an injunction should be denied.

## II.   BACKGROUND

The Board of Governors is an independent agency of the U.S. government that guides the operation of the Federal Reserve System, the central bank of the United States.  The New York Fed is one of twelve regional Federal Reserve Banks, which, together with the Board of Governors and the Federal Open Market Committee, comprise the key components of the Federal Reserve System.  The Federal Reserve System "monitors financial system risks and engages at home and abroad to help ensure that the system supports a healthy economy for U.S. households, communities, and businesses."[6]

---

[3] *See* John C. Williams, *901 Days*, Remarks at Securities Industry and Financial Markets Association (July 15, 2019), *available at* https://www.newyorkfed.org/newsevents/speeches/2019/wil190715 (as prepared for delivery); Jerome H. Powell, Introductory Comments at the Roundtable on the Interim Report of the Alternative Reference Rates Committee (June 21, 2016), *available at* https://www.federalreserve.gov/newsevents/speech/powell20160621a.htm.

[4] No party or person other than the Board of Governors, New York Fed, or their counsel authored this brief in whole or in part, or contributed money that was intended to fund preparing or submitting the brief.

[5] Pls.' Mot.; Pls.' Appl. for an Order to Show Cause Why an Inj. Should Not Issue (May 24, 2021), ECF No. 259.

[6] *Purposes and Functions of the Federal Reserve System*, p. 54, Tenth Edition, *available at* https://doi.org/10.17016/0199-9729.10.

LIBOR's use as a benchmark is ubiquitous.  As of March 2021, the gross notional value of all financial products tied to U.S. dollar LIBOR was approximately $223 trillion—about 10 times the U.S. GDP.[7]  That includes $4.8 trillion of business loans, $1.1 trillion of floating-rate notes and bonds, another $1.6 trillion of securitizations, and $1.4 trillion of residential mortgage and other consumer loans held by about four million individual consumers.[8]  The remaining exposures are derivative contracts, which we learned from the financial crisis are closely linked to all sectors of the financial markets and the real economy.[9]  In total, payments on over $223 trillion of exposures depend in the first instance on LIBOR being available.

Reference rate reform, including the orderly cessation of the use of LIBOR, is a global financial stability priority coordinated at the international level by the Financial Stability Board, which is currently co-chaired by Board of Governors' Vice-Chair Randal Quarles.  In the United States, the Financial Stability Oversight Council ("FSOC")—an entity established by Congress in response to the 2008 financial crisis and charged with identifying risks to the financial stability of the United States—recommended that U.S. financial regulators cooperate with foreign regulators, international bodies, and market participants to promote a "smooth and orderly" transition from LIBOR, considering issues of stability and market disruption.[10]  In support of a coordinated transition, Board of Governors Chair (then Governor) Jerome Powell has cautioned:  "The sudden cessation of a benchmark as heavily used as LIBOR would present significant systemic risks.  It could entail substantial losses and would create substantial uncertainty, potential legal challenges, and payments disruptions for the market participants that have relied on LIBOR."[11]  For this reason, New York Fed President John Williams has stressed

---

[7] *Progress Report*, *supra* n.1 Table 1.

[8] *Id.*

[9] *See* Michael Held, *SOFR and the Transition from LIBOR*, Remarks at the SIFMA C&L Society February Luncheon (Feb 26, 2019), *available at* https://www.newyorkfed.org/newsevents/speeches/2019/hel190226 (as prepared for delivery).

[10] *See 2013 Annual Report*, Financial Stability Oversight Council, at 14-15, *available at* https://home.treasury.gov/system/files/261/FSOC-2013-Annual-Report.pdf.

[11] Governor Jerome H. Powell, Introductory Comments at the Roundtable on the Interim Report of the Alternative Reference Rate Committee (June 21, 2016), *available at* https://www.federalreserve.gov/newsevents/speech/powell20160621a.htm.

that "the LIBOR transition is essential to the integrity of the *global* financial system."[12]

In the years since the FSOC's call to action, the Board of Governors, New York Fed, and FSOC members have taken numerous actions to prepare the financial system for the smooth and orderly ending to LIBOR.  One such action was in 2014, when the Board of Governors and New York Fed jointly convened the Alternative Reference Rates Committee ("ARRC"), a group of private-sector entities, to help ensure a smooth and orderly transition away from LIBOR.[13] Attesting to the importance of this transition effort across the financial system, the ARRC's participants include all key federal and state regulators involved in the various sectors affected by the LIBOR transition.[14]  Since 2014, the ARRC has worked to secure an orderly transition by recommending a more robust and liquid alternative to LIBOR for market participants to use if they so choose, identifying best practices for contract robustness, and creating a detailed transition plan.[15]

In November 2020, ICE Benchmark Administration Limited ("IBA") proposed clear end-dates for LIBOR: December 31, 2021 (for the 1-week and 2-month LIBOR settings) and June 30, 2023 (for all other LIBOR settings).[16]  The Board of Governors "welcomed and supported" IBA's proposal, noting that it would allow "most legacy contracts . . . to mature before LIBOR

---

[12] John C. Williams, *Measure Twice, Cut Once*, Remarks at SOFR Symposium: The Final Year (Part II) (May 11, 2021), *available at* https://www.newyorkfed.org/newsevents/speeches/2021/wil210511 (as prepared for delivery).

[13] *See 2020 Annual Report*, Financial Stability Oversight Council, at 123, *available at* https://home.treasury.gov/system/files/261/FSOC2020AnnualReport.pdf.

[14] The ARRC's ex officio members, in addition to the Board of Governors and the New York Fed, are the Commodity Futures Trading Commission, Consumer Financial Protection Bureau, Federal Deposit Insurance Corporation, Federal Housing Finance Agency, National Association of Insurance Commissioners, New York Department of Financial Services, Office of Financial Research, Office of the Comptroller of the Currency, U.S. Department of Housing and Urban Development, U.S. Securities and Exchange Commission, and U.S. Department of the Treasury.

[15] *See 2019 Annual Report*, Financial Stability Oversight Council, at 6, 13, 124, *available at* https://home.treasury.gov/system/files/261/FSOC2019AnnualReport.pdf.

[16] *See ICE LIBOR® Consultation on Potential Cessation*, IBA, at 3 (Dec. 2020), *available at* https://www.theice.com/publicdocs/ICE_LIBOR_Consultation_on_Potential_Cessation.pdf.

stops."[17]  IBA finalized these end-dates for LIBOR in March 2021.[18]

### III.   ARGUMENT

### A.   PLAINTIFFS' REQUESTED INJUNCTION WOULD LIKELY DESTABILIZE FINANCIAL MARKETS, POSE A SIGNIFICANT RISK TO FINANCIAL STABILITY, AND BE AGAINST THE PUBLIC INTEREST

Plaintiffs seeking a preliminary injunction must establish that they are "likely to succeed on the merits, that [they are] likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [their] favor, and that an injunction is in the public interest." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  "In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction."  *Id.* at 24 (*quoting Weinberger v. Romero-Barcelo,* 456 U.S. 305, 312 (1982) (quotation marks omitted)); *see also Miller ex rel. NLRB v. Cal. Pac. Med. Ctr.*, 991 F.2d 536, 540 (9th Cir. 1993), *on reh'g*, 19 F.3d 449 (9th Cir. 1994) ("[T]he public interest is a factor which courts must consider in *any* injunctive action in which the public interest is affected." (citation and quotation marks omitted)).

In this action, Plaintiffs have moved for a preliminary injunction requesting that this Court, among other relief, enjoin Defendants from "set[ting] or observ[ing] LIBOR" and "enforcing any financial instrument that relies in whole or in part on USD LIBOR."[19]  Plaintiffs also seek an order "voiding variable interest rate contracts for consumer loans which include LIBOR as a component of the variable interest rate."[20]  These are extraordinary and abrupt remedies that are fundamentally against the public interest.

---

[17] *See* Press Release, Board of Governors, *Federal Reserve Board welcomes and supports release of proposal and supervisory statements that would enable clear end date for U.S. Dollar (USD) LIBOR and would promote the safety and soundness of the financial system* (November 30, 2020), *available at* https://www.federalreserve.gov/newsevents/pressreleases/bcreg20201130b.htm.

[18] *See ICE LIBOR® Feedback Statement on Consultation on Potential Cessation*, IBA (Mar. 5, 2021), *available at* https://theice.com/publicdocs/ICE_LIBOR_feedback_statement_on_consultation_on_potential_cessation.pdf.

[19] Pls.' Mot. at iii.

[20] *Id.*

Plaintiffs' requested relief, if granted, would have an adverse effect on countless nonparties, almost certainly destabilize financial markets, and pose a significant risk to overall financial stability. As such, it is appropriate for the Court to place particular weight on the public interest factor when evaluating whether an injunction is warranted. *See Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1139 (9th Cir. 2009) (noting importance of public interest factor if "the impact of an injunction reaches beyond the parties, carrying with it a potential for public consequences"); *see also Inst. of Cetacean Research. v. Sea Shepherd Conservation Soc'y*, 725 F.3d 940, 946 (9th Cir. 2013) ("The public interest inquiry primarily addresses impact on non-parties rather than parties." (citation and internal quotation marks omitted)).

The potential adverse consequences of such an injunction abruptly ending the publication and use of LIBOR would be significant. Without an orderly transition away from LIBOR, there would undoubtedly be confusion and uncertainty in all markets that currently rely on LIBOR on a day-to-day basis. Likely consequences include: 1) freezing or disrupting the trading of financial contracts; 2) upending consumer contracts, including mortgages and student loans; 3) harming the safety and soundness of financial institutions; and 4) undermining public confidence in financial markets and creating an avalanche of litigation.

### 1. Freezing or Disrupting the Trading of Financial Contracts

Plaintiffs' requested injunction, if granted, would likely make it impossible for market participants to reliably value their LIBOR-based holdings or arrive at mutually agreeable prices for trading them, and therefore would disrupt trading in the massive number of financial instruments that rely on LIBOR.[21] This disruption would almost certainly impair the functioning of the many markets in which those instruments are traded,[22] causing high price volatility and unreliable liquidity in the affected instruments. As a result, market liquidity and price transparency so important to investors of all types—from large pension funds to individuals investing their savings in bond funds—may disappear overnight. Holders of LIBOR-based instruments who are not seeking to buy or sell would also be affected because there may be no

---

[21] *See 2019 Annual Report*, *supra* n.15 at 6.

[22] *See 2018 Annual Report*, Financial Stability Oversight Council, at 108 (rev. June 2019), *available at* https://home.treasury.gov/system/files/261/FSOC2018AnnualReport.pdf.

way to value such instruments, or values could be very volatile.  Businesses of all sizes need to manage their cash flows, hedge their interest rate risks, and value their LIBOR-based assets and liabilities—all activities that would be severely disrupted.  Contracts tied to LIBOR may be thrown into limbo, with no way to know which terms of a contract remain operative or whether the contract is entirely void.

While many market participants have prepared for the end of LIBOR by incorporating "fallback" language into their contracts specifying alternative terms, many other financial contracts do not yet contemplate the permanent end to LIBOR.  Additionally, because there is no mechanism to readily distinguish those contracts that have effective fallback language from those that do not, the markets will likely treat all LIBOR-based instruments as one and the same.  Finally as an operational matter, even contracts that do have clear fallback provisions would not be able to transition abruptly on such a large scale without significant advance planning.  As a result, an abrupt cessation of LIBOR would broadly and negatively affect a wide array of instruments, even if fallback language has been adopted.

**2.     Upending Consumer Contracts, Including Mortgages and Student Loans**

An abrupt cessation of LIBOR would also harm consumers because of the impact on outstanding consumer loans, including residential mortgages, as well as the market for such loans.[23]  The millions of consumers with LIBOR-based mortgages or student loans, for example, may be thrown into confusion as their payments become impossible to compute due to the absence of LIBOR settings.  Moreover, a declaration that LIBOR-tied consumer loans are "void" would throw those contracts into limbo, with no way for consumers and their lenders to know the terms of their mortgages and other loans or what it means to be a party to a "voided" contract.

**3.     Impacting the Safety and Soundness of Certain Financial Institutions**

The use of LIBOR is hard-wired into systems, products, and processes for many financial firms.[24]  In March of this year, the Board of Governors issued detailed guidance to examiners to

---

[23] *See* Held, *SOFR and the Transition from LIBOR*, *supra* n.9; *2018 Annual Report*, *supra* n.22 at 108.

[24] *See* John C. Williams, *LIBOR: The Clock Is Ticking*, Remarks at the 2019 U.S. Treasury Market Conference (Sept. 23, 2019), *available at* https://www.newyorkfed.org/newsevents/speeches/2019/wil190923 (as prepared for delivery).

assess firms on their transition efforts.[25]  The safety and soundness of some financial institutions that rely significantly on LIBOR-based funding or maintain large holdings of LIBOR-based assets could be called into question if LIBOR were to abruptly cease.[26]  And, more broadly, an abrupt cessation of LIBOR would likely disrupt the flow of credit from the financial sector to the real economy, including consumers and non-financial businesses.

### 4. Undermining Public Confidence in Financial Markets and Creating an Avalanche of Litigation

Finally, if LIBOR is abruptly enjoined, the smooth and orderly transition away from LIBOR that has been promoted by the global regulatory community would not occur, public confidence in the financial markets would almost certainly sink, and an avalanche of litigation would likely follow.  Courts may be required to take on the herculean task of examining the details of each individual LIBOR-based contract and deciding how to resolve each dispute equitably, resulting in additional uncertainty and market disruption.

### IV.   CONCLUSION

The LIBOR transition may be one of the most significant and complex infrastructure reform challenges the financial markets have ever faced.[27]  The Board of Governors and New York Fed have for years been part of the global effort to carefully and responsibly ensure that consumers, financial institutions, markets, and the stability of the financial system are not jeopardized by an abrupt and disorderly transition.  Plaintiffs' requested injunction would undo those efforts, would harm the public interest by having adverse effects on the economy and

---

[25] The guidance included (1) transition planning; (2) financial exposure measurement and risk assessment; (3) operational preparedness and controls; (4) legal contract preparedness; (5) communication; and (6) oversight.  *SR 21-7: Assessing Supervised Institutions' Plans to Transition Away from the Use of LIBOR*, Board of Governors of the Federal Reserve System (March 9, 2021), *available at* https://www.federalreserve.gov/supervisionreg/srletters/SR2107.htm.

[26] *See*, *e.g.*, *Statement on LIBOR Transition*, Board of Governors of the Federal Reserve System, Federal Deposit Insurance Corporation and Office of the Comptroller of the Currency (November 30, 2020), *available at* https://www.federalreserve.gov/supervisionreg/srletters/SR2027a1.pdf.

[27] *See* Nathaniel Wuerffel, *Transitioning Away From LIBOR: Understanding SOFR's Strengths and Considering the Path Forward*, Remarks at the Bank Policy Institute's Credit-Sensitive Benchmark Symposium (Sept. 18, 2020), ECF 136-1, *available at* https://www.newyorkfed.org/newsevents/speeches/2020/wue200918 (as prepared for delivery).

countless nonparties to the litigation, and would introduce substantial risks and injury.

For the foregoing reasons, Plaintiffs' motions for an injunction should be denied.

| | |
|---|---|
| DATED: August 13, 2021 | Respectfully submitted, |
| | FEDERAL RESERVE BANK OF NEW YORK<br>MICHAEL HELD (*pro hac vice* pending)<br>   *General Counsel*<br>KATHERINE STEELE LANDY (*pro hac vice* pending)<br>ALEX LEONARD (*pro hac vice* pending) |
| | By:  */s/ Michael Held*<br>     Michael Held<br>Attorneys for *Amicus Curiae* Federal Reserve Bank of New York |
| DATED: August 13, 2021 | DAVIS WRIGHT TREMAINE LLP<br>JEFFREY S. BOSLEY |
| | By:  */s/ Jeffrey S. Bosley*<br>     Jeffrey S. Bosley<br>Attorneys for *Amicus Curiae* Federal Reserve Bank of New York |
| DATED: August 13, 2021 | BOARD OF GOVERNORS<br>OF THE FEDERAL RESERVE SYSTEM<br>MARK VAN DER WEIDE<br>   *General Counsel*<br>RICHARD M. ASHTON<br>JOSHUA P. CHADWICK<br>KATHERINE POMEROY |
| | By:  */s/ Joshua P. Chadwick*<br>     Joshua P. Chadwick<br>Attorneys for *Amicus Curiae* Board of Governors of the Federal Reserve System |

**CIVIL LOCAL RULE 5-1(i)(3) ATTESTATION**

I hereby attest that concurrence in the filing of this document has been obtained from each of the other signatories hereto.

Dated: August 13, 2021                    By: */s/ Jeffrey S. Bosley*
                                                  Jeffrey S. Bosley