UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LISA MCCARTHY, et al.,<br><br>    Plaintiffs,<br><br>    v.<br><br>INTERCONTINENTAL EXCHANGE, INC., et al.,<br><br>    Defendants. | Case No. 20-cv-05832-JD<br><br>**ORDER RE INJUNCTION**<br>Re: Dkt. Nos. 19, 259 |

In this consumer antitrust action, Lisa McCarthy and twenty-six other plaintiffs allege that a number of banks and financial institutions have engaged in a conspiracy to fix the intra-bank interest rate known as the USD LIBOR. Dkt. No. 1. The gravamen of the complaint is that the LIBOR formula and procedures themselves, which have been publicly known since the 1980s, are inherently anticompetitive, and that defendants' participation in determining LIBOR is itself a conspiracy. In this respect, this case is entirely different from long-running litigation in other courts which alleged that banks and other financial institutions manipulated the submissions used to determine the LIBOR. *See Gelboim v. Bank of America Corp.*, 823 F.3d 759, 764 (2d Cir. 2016) ("[i]t is alleged that the Banks colluded to depress LIBOR by violating the rate-setting rules" so that "the payout associated with the various financial instruments was thus below what it would have been" absent the manipulation). Plaintiffs are consumers of loans and credit cards with variable interest rates, and say they paid artificially inflated interest rates as a result of defendants' conduct.

Plaintiffs have filed a motion for preliminary and permanent injunction under Federal Rule of Civil Procedure 65, which asks that defendants be prohibited from, among other things, "continuing to engage in their price-fixing scheme" and "enforcing any financial instrument that

relies in whole or in part on USD LIBOR." Dkt. No. 19 at iii. Plaintiffs also seek an order "voiding variable interest rate contracts for consumer loans which include LIBOR as a component of the variable interest rate." *Id*.

In a subsequent "application for an order to show cause why an injunction should not issue," Dkt. No. 259, plaintiffs again sought what is effectively the same relief. They asked the Court to issue "an order to show cause why defendants should not be enjoined and prohibited from continuing to engage in their LIBOR price-fixing scheme" and prohibited "from enforcing the LIBOR part of any financial instrument, including mortgages, student loans, credit cards, auto loans and lines of credit, that rely in whole or in part on USD LIBOR." *Id*. at 8. The OSC application also asks the Court to "declare void any agreement or contract for a variable interest rate consumer loan that includes USD LIBOR as a component of its variable interest rate," as well as "require that defendants post a bond to secure the return of their retail customers' price-fixed overpayments and a bond to cover the difference between the federal treasury rate and the LIBOR price-fixed rate." *Id*.

Because the injunction and OSC requests are virtually identical, the Court will resolve both in the Rule 65 context. The requests are denied.

## LEGAL STANDARDS

"Preliminary injunctions are 'an extraordinary remedy never awarded as of right.'" *Michigan v. DeVos*, 481 F. Supp. 3d 984, 990 (N.D. Cal. 2020) (quoting *Winter v. Nat'l Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008)). "'A plaintiff seeking a preliminary injunction must establish that he [or she] is likely to succeed on the merits, that he [or she] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his [or her] favor, and that an injunction is in the public interest.'" *Id.* at 990-91 (quoting *Winter*, 555 U.S. at 20); *see also Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015) (same). "In our circuit, a plaintiff may also obtain a preliminary injunction under a 'sliding scale' approach by raising 'serious questions' going to the merits of plaintiff's claims and showing that the balance of hardships tips 'sharply' in his or her favor." *Michigan*, 481 F. Supp. 3d at 991 (quoting *A*

*Woman's Friend Pregnancy Res. Clinic v. Becerra*, 901 F.3d 1166, 1167 (9th Cir. 2018) and *Vanguard Outdoor, LLC v. City of Los Angeles*, 648 F.3d 737, 740 (9th Cir. 2011)).

"In all cases, at an 'irreducible minimum,' the party seeking an injunction 'must demonstrate a fair chance of success on the merits, or questions serious enough to require litigation.'" *Maffick LLC v. Facebook, Inc.*, No. 20-cv-05222-JD, 2020 WL 5257853, at *1 (N.D. Cal. Sept. 3, 2020) (quoting *Pimentel v. Dreyfus*, 670 F.3d 1096, 1105-06 (9th Cir. 2012) (cleaned up)); *see also Garcia*, 786 F.3d at 740 ("The first factor under *Winter* is the most important -- likely success on the merits."). Because of this importance, when "a plaintiff has failed to show the likelihood of success on the merits, we need not consider the remaining three [*Winter* elements]." *Garcia*, 786 F.3d at 740 (internal quotations and citations omitted).

## DISCUSSION

### I. ARTICLE III STANDING

Defendants say that plaintiffs lack Article III standing to sue. Dkt. No. 133 at 5-6. Consequently, the Court starts, as it must, with the justiciability of this controversy.

Under Article III of the Constitution, federal courts have "the power to decide legal questions only in the presence of an actual 'Cas[e]' or 'Controvers[y].'" *Wittman v. Personhuballah*, 578 U.S. 539, 543 (2016). Plaintiffs have invoked federal jurisdiction, and so they bear the burden of showing that they have "suffered an 'injury in fact'" that is "'fairly traceable' to the conduct being challenged" and which "will likely be 'redressed' by a favorable decision." *Id.* (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)).

Standing to sue under Article III "must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation." *Lujan*, 504 U.S. at 561. In this "very preliminary stage of the litigation," the Court will take into account the "allegations in [plaintiffs'] complaint and whatever other evidence they submitted in support of" their preliminary injunction motion. *Washington v. Trump*, 847 F.3d 1151, 1159 (9th Cir. 2017).

"At the preliminary injunction stage, plaintiffs must make a clear showing of each element of standing." *Townley v. Miller*, 722 F.3d 1128, 1133 (9th Cir. 2013) (citations omitted). When

3

there are multiple plaintiffs, as is the case here, the presence of one plaintiff with standing "assures that [the] controversy before [the] Court is justiciable." *Dept. of Commerce v. U.S. House of Representatives*, 525 U.S. 316, 330 (1999) (citing *Director, Office of Workers' Compensation Programs v. Perini North River Assocs.*, 459 U.S. 297, 303-05 (1983)).

Defendants' Article III objection is not well taken. The complaint alleges that plaintiffs are "consumers of variable interest rate loans"; "USD LIBOR is an unlawful rate regularly utilized as a component of the pricing in variable interest rate consumer loans by the defendants and their co-conspirators"; and plaintiffs "have been damaged and are threatened with damage in that they have paid and will pay anticompetitive rates in the future for variable interest rate loans." Dkt. No. 1 ¶ 4. On that score, plaintiff McCarthy filed a declaration attesting that she is "a consumer of variable interest rate loans, including a Capital One credit card with a variable interest rate tied to USD LIBOR." Dkt. No. 212-1 ¶ 2. The complaint also alleges that defendants conspired to fix the USD LIBOR rate with an agreed-upon formula that excluded the lowest submitted rates, and that a "reasonable estimate of the competitive price" is "the lowest rate submitted by the contributor banks, which is excluded by virtue of defendants' unlawful combination or conspiracy." Dkt. No. 1 ¶¶ 43, 45. Plaintiffs provided a declaration by Patricia Plonsker, a "financial analyst and management consultant specializing in interest rate risk for financial institutions," who states that "the impact of the US LIBOR price-fixing formula on US consumers is enormous" and has resulted in "excess overcharge interest accrued on outstanding loans." Dkt. No. 19-2 at 3 & ¶ 28.[1]

These factors amply establish plaintiffs' standing to sue under Article III. To be sure, "[s]tanding is an ongoing inquiry" and the need to satisfy the requirements of Article III "persists throughout the life of the lawsuit," with the later stages of the case requiring more of plaintiffs

---

[1] Defendants' requests to strike Plonsker's declarations under Federal Rule of Evidence 702, Dkt. Nos. 135, 266, are denied without prejudice to possible consideration down the road. A "trial court may give even inadmissible evidence some weight" in a preliminary injunction analysis. *Flynt Distributing Co., Inc. v. Harvey*, 734 F.2d 1389, 1394 (9th Cir. 1984); *see also Johnson v. Couturier*, 572 F.3d 1067, 1083 (9th Cir. 2009). The Court considered the Plonsker declaration at Dkt. No. 19-2 for the specific question of standing, but did not rely on any of Plonsker's declarations for the analysis of the preliminary injunction factors.

than is required at this early stage. *Heeger v. Facebook, Inc.*, 509 F. Supp. 3d 1182, 1188 (N.D. Cal. 2020) (citation omitted). But at this stage, plaintiffs are positioned to sue.

## II.     LIKELIHOOD OF SUCCESS

The threshold inquiry under *Winter* is plaintiffs' likelihood of success. Plaintiffs state in the complaint two antitrust violations by defendants: (1) price fixing in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1; and (2) a conspiracy to monopolize in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2. Dkt. No. 1 ¶¶ 68-85. The injunction requests are based on the Section 1 claim only, *see* Dkt. No. 19 at 1 & Dkt. No. 259 at 1, and so the merits inquiry focuses on that claim only. The question is whether plaintiffs have demonstrated a likelihood of success, or at the very least a serious question, on their Section 1 claim that warrants the extraordinary remedy of a preliminary injunction.

They have not. The salient facts for this conclusion are largely undisputed. The parties agree that, since the mid-1980s, a group of banks have worked together to set a daily LIBOR rate. Dkt. No. 1 ¶¶ 32-33. To set the rate, each panel bank provided an answer to the question, "At what rate could you borrow funds, were you to do so by asking for and then accepting inter-bank offers in a reasonable market size just prior to 11 a.m.?" *Id*. ¶ 33. Since management of the LIBOR was handed over from the British Bankers' Association (BBA) to defendant Intercontinental Exchange Benchmark Administration Limited (IBA) in 2014, IBA has continued to solicit this input data from panel banks. *Id*. ¶¶ 36-38. IBA then calculates LIBOR "using a trimmed arithmetic mean" in which "the highest and lowest quartiles of submissions are excluded" and "[a] mean is calculated from the remaining middle quartiles, rounded to five decimal places." *Id*. ¶ 43.

The setting of the daily LIBOR is subject to regulatory oversight. The Financial Conduct Authority (FCA), a creature of U.K. law, is charged with "regulat[ing] LIBOR and supervis[ing] both LIBOR submitters and its administrator." Dkt. No. 133 at 8. The parties agree that the FCA is in the process of phasing LIBOR out. *See* Dkt. No. 212 (plaintiffs' reply brief) at 8 ("Defendants have pledged to sunset the LIBOR formula by the end of 2023"); Dkt. No. 133 (defendants' opposition brief) at 1 ("The global financial community has been carefully planning

5

for the eventual transition from LIBOR to alternative benchmarks through a phase-out process supervised by financial regulators and central banks.").

The parties do not dispute the nearly universal use of the LIBOR rate in the banking world. The complaint alleges that the rate is "used by an estimated US $350 trillion . . . of outstanding contracts in maturities ranging from overnight to more than 30 years." Dkt. No. 1 at 3. Defendants make the same point to the effect that an injunction against "continuing to set or observe LIBOR" would "massively disrupt global financial markets, causing grave uncertainty regarding rights and obligations under contracts that reference LIBOR." Dkt. No. 133 at 12.

Plaintiffs say they have demonstrated a likelihood of success on the merits by virtue of a single United States Supreme Court decision of an older vintage: *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150 (1940). That is in effect the entirety of plaintiffs' legal argument. *See* Dkt. No. 19 at 2 ("Plaintiffs' success on the merits is manifest" under *Socony*); *see also id.* at 9-10 (same). Much of plaintiffs' argument simply hurls block quotes from *Socony* like projectiles from a catapult, because plaintiffs "believe that the simple statements by the Supreme Court, which are clear, concise and cogent, are more persuasive than any arguments that anyone else could make." Dkt. No. 288 at 2-4.

This almost exclusive reliance on *Socony* is misplaced. It is certainly true that "[a]ny combination which tampers with price structures is engaged in an unlawful activity." *Socony*, 310 U.S. at 221. But plaintiffs' insistence that the merits analysis should stop with a highly general and undisputed proposition of antitrust law plucked from *Socony* is not correct. To start, plaintiffs overlook the distinguishing fact that *Socony* was a criminal case where the defendants were convicted at trial of a conspiracy that was "not to be found in any formal contract or agreement." *Id.* at 177. In addition, legal developments in the 81 years since *Socony* was published cast considerable doubt on plaintiffs' rather mechanical analysis. In *Broadcast Music, Inc. v. Columbia Broadcasting System, Inc.*, 441 U.S. 1, 9 (1979), the Supreme Court expressly stated that the question was not "simply [one] of determining whether two or more potential competitors have literally 'fixed' a 'price.'" The Court cautioned that "[l]iteralness is overly simplistic and often overbroad. When two partners set the price of their goods or services they are literally 'price

6

1  fixing,' but they are not *per se* in violation of the Sherman Act." *Broadcast Music*, 441 U.S. at 9.
In *Texaco Inc. v. Dagher*, 547 U.S. 1, 6 (2006), the Court again underscored that the defendants' "pricing policy may be price fixing in a literal sense," but "it is not price fixing in the antitrust sense."

Plaintiffs did not engage with these developments, and simply pound *Socony* to say that price fixing is illegal. *See, e.g.*, Dkt. No. 288 at 1. This will not do for present purposes. To be sure, the Court embraces the proposition that horizontal price fixing is a *per se* violation of the Sherman Act Section 1. *See United States v. Florida*, No. 4:14-cr-00582-JD, 2017 WL 1374599, at *2 (N.D. Cal. Apr. 17, 2017). But that does not mean that simply adding the LIBOR formula to this legal principle amounts to proof that plaintiffs are entitled to immediately void $350 trillion dollars' worth of contracts on a preliminary basis, especially when the Supreme Court has repeatedly cautioned since *Socony* that the antitrust laws should not be applied in such a rote manner.

Overall, plaintiffs have not carried their burden of establishing a likelihood of success sufficient to warrant the extraordinary relief of a preliminary injunction. Even if plaintiffs were said to have raised a serious question about the Section 1 claim, an injunction would still be unwarranted because they have failed to satisfy the other *Winter* factors.[2]

## III. IRREPARABLE HARM, BALANCE OF THE EQUITIES, AND THE PUBLIC INTEREST

Plaintiffs have not established an imminent threat of irreparable harm. The injury plaintiffs claim is that they paid too much in interest rates, but "[i]t is well established . . . that such monetary injury is not normally considered irreparable." *Maffick*, 2020 WL 5257853, at *3 (quoting *Los Angeles Memorial Coliseum Comm'n v. Nat'l Football League*, 634 F.2d 1197, 1202 (9th Cir. 1980)). Plaintiffs also acknowledge that the LIBOR formula and procedures they attack have been publicly known and in continuous use since the 1980s. Dkt. No. 19 at 4. Why these well-known, decades-old practices are suddenly ripe for emergency relief in 2021 is not explained.

---

[2] Because plaintiffs' merits showing is lacking, the Court need not resolve defendants' other "likelihood of success" arguments, such as antitrust standing or personal jurisdiction. Dkt. No. 133 at 6-7, 9-10. Those issues will be addressed as warranted at a later stage of the case.

This delay further undermines a claim of irreparable harm.  *See Cal. Physicians Serv., Inc. v. Healthplan Servs., Inc.*, No. 3:18-cv-03730-JD, 2021 WL 879797, at *7 (N.D. Cal. Mar. 9, 2021).

The "balance of equities" does not tip in plaintiffs' favor.  *See Winter*, 555 U.S. at 24-31.  Other than plaintiff McCarthy, none of the plaintiffs have demonstrated that they are paying a variable interest rate that is tied to LIBOR.  Dkt. No. 212-2 - 212-8.  Consequently, the hardship to plaintiffs is, on the whole, minor and purely monetary.  In contrast, defendants have established that if the Court were to enjoin LIBOR across the board, as plaintiffs propose, substantial and possibly catastrophic consequences would ensue in the global financial market.  *See* Dkt. No. 133 at 14-15; Dkt. No. 136.  Plaintiffs did not contest this showing.

For the same reason, the public interest factor weighs heavily against plaintiffs.  This factor looks at an injunction's "impact on non-parties rather than parties."  *Bernhardt v. L.A. Cnty.*, 339 F.3d 920, 931 (9th Cir. 2003) (citation omitted).  An amicus brief filed by the Chamber of Commerce of the United States of America and others demonstrates that the injunction plaintiffs request would "inject great uncertainty into financial transactions, pose systemic risks to the financial system, and leave parties to millions of contracts without a mechanism to calculate their payment obligations."  Dkt. No. 214-1 at 1.  Another amicus brief filed by the Federal Reserve Bank of New York and the Board of Governors of the Federal Reserve System also establishes that an "abrupt end to LIBOR without an orderly transition would be detrimental to the public interest with consequences that could include . . . upending consumer contracts, including mortgages and student loans."  Dkt. No. 282-1 at 1.  Plaintiffs rather glibly dismiss these serious concerns by saying that "[f]inancial disasters are irrelevant in price fixing cases."  Dkt. No. 318 at 1.  Not so under *Winter*.  The public interest factor is a critical component of a preliminary injunction analysis, and plaintiffs have failed to show that the public interest supports the injunction they have asked for.[3]

## CONCLUSION

The motion for injunction and application for an order to show cause are both denied, Dkt.

---

[3] Defendants' objection to new reply evidence, Dkt. No. 292, is terminated as moot.  The evidence objected to played no role in this order.

Nos. 19, 259, as are defendants' requests to strike and their evidentiary objection. Dkt. Nos. 135, 266, 292. The Financial Conduct Authority's motion for leave to file an amicus brief, Dkt. No. 349, is terminated as moot in light of this order. The motions to dismiss that were taken under submission, Dkt. No. 342, will be resolved in a separate order.

**IT IS SO ORDERED.**

Dated: December 23, 2021

JAMES DONATO
United States District Judge