Joseph M. Alioto (SBN 42680)
Tatiana V. Wallace, Esq. (SBN 233939)
ALIOTO LAW FIRM
One Sansome Street, 35th Floor
San Francisco, CA  94104
Telephone:  (415) 434-8900
Email:  jmalioto@aliotolaw.com


[ADDITIONAL COUNSEL LISTED ON LAST PAGE]


**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**


LISA MCCARTHY, MARY KATHERINE ARCELL, CHRISTINE M WHALEN, KEITH DEAN BRADT, JOSE BRITO, JAN-MARIE BROWN, ROSEMARY D'AUGUSTA, BRENDA DAVIS, PAMELA FAUST, CAROLYN FJORD, DONALD C. FREELAND, DONALD FRYE, GABRIEL GARAVANIAN, HARRY GARAVANIAN, YVONNE JOCELYN GARDNER, VALARIE JOLLY, MICHAEL MALANEY, LENARD MARAZZO, TIMOTHY NIEBOER, DEBORAH PULFER, BILL RUBINSOHN, SONDRA RUSSELL, JUNE STANSBURY, CLYDE DUANE STENSRUD, JUDITH ANN BRAY, GARY TALEWSKY, DIANA LYNN ULTICAN

         Plaintiffs,

      v.

INTERCONTINENTAL EXCHANGE, INC., INTERCONTINENTAL EXCHANGE HOLDINGS, INC., ICE BENCHMARK ADMINISTRATION LIMITED, ICE DATA SERVICES, INC., ICE PRICING AND REFERENCE DATA LLC, BANK OF AMERICA, N.A., BANK OF AMERICA CORPORATION, BARCLAYS BANK, PLC, BARCLAYS CAPITAL, INC., CITIBANK, N.A., CITIGROUP, INC., CITIGROUP

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

CASE NO.:  3:20-cv-5832-JD


**FIRST AMENDED COMPLAINT FOR PERMANENT INJUNCTION AND FOR DAMAGES AGAINST DEFENDANTS' VIOLATIONS OF §§ 1 AND 2 OF THE SHERMAN ANTITRUST ACT, 15 U.S.C. §§ 1, 2**


**<u>JURY TRIAL DEMANDED</u>**

*First Amended Complaint for Violations of §§ 1 and 2 of the Sherman Act*

GLOBAL MARKETS, INC.,
COÖPERATIEVE RABOBANK U.A., )
CREDIT SUISSE GROUP AG, CREDIT )
SUISSE AG, DEFENDANT CREDIT SUISSE )
SECURITIES (USA) LLC, DEUTSCHE )
BANK AG, DEUTSCHE BANK )
SECURITIES INC., HSBC HOLDINGS PLC, )
HSBC BANK PLC, HSBC BANK USA, N.A., )
HSBC SECURITIES (USA) INC., )
JPMORGAN CHASE & CO., JPMORGAN )
CHASE BANK, N.A., J.P. MORGAN )
SECURITIES LLC, LLOYDS BANK PLC, )
LLOYDS SECURITIES INC., MUFG BANK, )
LTD., THE BANK OF TOKYO- )
MITSUBISHI UFJ LTD., MITSUBISHI UFJ )
FINANCIAL GROUP INC., MUFG )
SECURITIES AMERICAS INC., ROYAL )
BANK OF SCOTLAND GROUP PLC, )
ROYAL BANK OF SCOTLAND PLC, )
NATIONAL WESTMINSTER BANK PLC, )
NATWEST MARKETS SECURITIES INC., )
SUMITOMO MITSUI BANKING )
CORPORATION, SUMITOMO MITSUI )
FINANCIAL GROUP INC., SUMITOMO )
MITSUI BANKING CORPORATION )
EUROPE LTD., SMBC CAPITAL )
MARKETS, INC., UBS GROUP AG, UBS )
AG, AND UBS SECURITIES LLC, )
)
        Defendants. )
_____ )

1.     In August of 2020, the Plaintiffs filed their complaint and motion for an order

to show cause why the Defendants should not be prohibited from fixing the price of an agreed

formula to fix the LIBOR intra bank interest rate, said to be the most important number in the

world, affecting, as claimed by a senior executive of JPMorgan, more than $400 Trillion

($400,000,000,000,000) in financial instruments throughout the world, specifically including

consumer products such as mortgages, student loans, automobile loans and other consumer

products, as well as business and financial instruments involving swaps and other trades.

2. The Defendants predictably responded to the Plaintiffs' complaint and order to show cause with "insolent outrage" and spurious claims that their price-fixing was reasonable under the laws of the United Kingdom, and that they had the acquiescence of important people and organizations, as well as foreign regulatory authorities.

3. Specifically because of this very case, that response has changed. The Defendant IBA, as a result of this very case, has published the following implied recognition that the use of LIBOR in the United States, affecting the trade and commerce of the United States, may be prohibited as a violation of the antitrust laws of the United States:

> "The use of LIBOR in jurisdictions outside the United Kingdom [the United States] and by entities subject to the oversight of other regulatory authorities [the United States Congress and the United States Supreme Court] may be restricted or prohibited by law in those jurisdictions and by the requirements of such regulatory authorities."[1]

4. Plaintiffs now file this First Amended Complaint pursuant to Order of the Court.

5. This is a private antitrust case brought under Sections 4 and 16 of the Clayton antitrust act. It claims damages and injunctive relief caused by reason of violations of Sections 1 and 2 of the Sherman Act. Plaintiffs seek damages and injunctive relief, including the disgorgement of Defendants' illegally obtained profits, the dismemberment of Defendants in accordance with the protocols required by reason of their serial violations of the antitrust laws, and dissolution of the LIBOR combination.

6. Plaintiffs complain and allege as follows:

---

[1] Ice Benchmark Administration LIBOR, *Using LIBOR*,   https://www.theice.com/iba/libor , published as of at least 10/2/2022.

*First Amended Complaint for Violations of §§ 1 and 2 of the Sherman Act*

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**INTRODUCTION**

7.     Since the mid-1980s and continued up to and including the filing of this

Complaint, Defendants have been and are members of a price-fixing cartel designed to

eliminate price competition between and among themselves and among their co-conspirators

to fix the intra bank interest rate used as the minimum rate offered for loans to consumers and

businesses, including, inter alia, for mortgages, student loans, credit cards, auto loans, lines of

credit, contracts, and all varieties of financial instruments.  This rate is known as the London

Inter-Bank Interest Rate or LIBOR.

8.     This price-fixed LIBOR rate is commonly accepted as "the world's most

important number," used by an estimated US $350 trillion ($350,000,000,000,000)

of outstanding contracts in maturities ranging from overnight to more than 30 years.

9.     LIBOR is a registered trademark of the ICE Benchmark Administration Ltd.

(hereinafter "IBA".)  In its online publications, IBA has admitted that:

"LIBOR is a widely-used benchmark for short-term interest rates.

The current LIBOR methodology, which used input data provided by LIBOR panel

banks (Panel Banks) is designed to produce an average rate that is representative of

the rates at which large, leading, internationally active banks with access to the

wholesale, unsecured funding market could fund themselves in such markets in

particular currencies for certain tenors.

"LIBOR is currently calculated for five currencies (USD< GBP, EUR, CHF and

JPY) and for seven tenors in respect of each currency (Overnight/Spot Next, One

Week, One Month, two Months, Three Months, Six Months and 12 Months).  This

results in the publication of 35 individual rates (one for each currency and tenor

combination) every appliable London business day.

*First Amended Complaint for Violations of §§ 1 and 2 of the Sherman Act*

Used globally, LIBOR is often referenced in derivative, bond and loan

documentation, and in a range of consumer lending instruments such as mortgages,

and student loans.  It is also used as a gauge of market expectation regarding

central bank interest rates, liquidity premiums in the money markets, and during

periods of stress, as an indicator of the health of the banking system."

10.     Now, as noted above, IBA has recognized that the use of  LIBOR in the United

States may be a violation of the antitrust laws of the United States:

"The use of LIBOR in jurisdictions outside the United Kingdom [the United

States] and by entities subject to the oversight of other regulatory authorities [the

United States Congress and the United States Supreme Court] may be restricted or

prohibited by law in those jurisdictions and by the requirements of such regulatory

authorities."[2]

11.     The formula to fix the rate agreed to by the Defendant banks and co-

conspirators, and their Defendant agents charged with calculating the agreed price-fixed

interest rate, is simple in its arithmetic and devastating in its implementation: As of the date of

the filing of the original complaint (1) the sixteen panel banks of which fifteen were original

Defendants in this case submit their proposals for what the interest rate should be to the

Defendant ICE US LIBOR; (2) the Defendant ICE US LIBOR excludes the four highest and

four lowest submitted rates; and then (3) averages the remaining eight. The result of this

agreed "trim average" is the LIBOR interest rate that Defendants have agreed in writing to be

published and used as a floor interest rate for financial instruments offered in the United States

---

[2] Ice Benchmark Administration LIBOR, *Using LIBOR*,   https://www.theice.com/iba/libor ,
published as of at least 10/2/2022.

*First Amended Complaint for Violations of §§ 1 and 2 of the Sherman Act*

and throughout the world by these Defendants and by other banks and financial institutions within the United States that have made LIBOR a part of their financial instruments.

12.     The Defendant banks agreed to this "trim average" formula, the resultant rate, and the implementation of it in their consumer and business loans and other financial products such as credit cards, mortgages and student loans. United States consumers, including certain of these Plaintiffs, have paid the fixed-price LIBOR rate as a minimum base rate on their loans and credit cards and/or have been substantially threatened with the possibility of injury or damage by reason of the continued use by Defendants and other financial institutions of the LIBOR fixed rate.

13.     The price-fixed rate used by the Defendant banks and their co-conspirators as the base LIBOR rate in their consumer and business and credit card loans is a *per se* violation of Sections 1 and 2 of the Sherman Antitrust Act. The consumer Plaintiffs are injured and damaged and/or substantially threatened with injury and damage, and are authorized to bring this suit pursuant to Sections 4 and 16 of the Clayton Antitrust Act.

14.     The price-fixing agreement between and among the Defendant banks and co-conspirators, and the continued use and enforcement of the price-fixing agreement, should and must be permanently enjoined. No consumer or business loan, including, inter alia, loans for mortgages, student loans, credit cards, auto loans, lines of credit, contracts, and all varieties of financial instruments, if based in whole or in part, or in any way infected or affected by the price-fixed LIBOR base interest rate, should be required to pay, directly or indirectly, the price-fixed USD LIBOR interest rate.

15.     The Plaintiffs pray for, and respectfully demand the entry of a permanent injunction voiding the Defendant banks' price-fixing agreement, enforcement of it, directly or indirectly, the disgorgement of the unlawful profits to the Treasury of the United States, the

dismemberment of Defendants in accordance with the protocols already in place, as was required by the United States as a condition of the 2008 bail-out of the banks, the damages caused by reason of Defendants' unlawful combination or conspiracy, and the award of reasonable attorneys fees and the cost of suit.

## JURISDICTION

16.     This action is brought under Sections 4 and 16 of the Clayton Antitrust Act, 15 U.S.C. §§ 15, 26, for damages and to prohibit Defendants' ongoing violations of §§ 1 and 2 of the Sherman Antitrust Act, 15 U.S.C. §§ 1, 2, caused by reason of Defendants unlawful agreement to fix the USD LIBOR rate, and their unlawful conspiracy to monopolize by agreeing to set the base USD LIBOR interest rate. This Court has subject matter jurisdiction of the federal antitrust claims asserted in this action under Sections 4 and 16 of the Clayton Antitrust Act, 15 U.S.C. §§ 15, 26, and Title 28 United States Code Sections 1331 and 1337.

17.     Defendants' conspiracy and conduct was within the flow of, was intended to, and did, in fact, have a substantial effect on the interstate commerce of the United States. During the relevant time period, Defendants intentionally targeted and used the instrumentalities of interstate commerce, including interstate wires, in furtherance of their illegal scheme. In addition, because Defendants transact business in this judicial district, venue is proper in this district court pursuant to 15 U.S.C. §§15, 22 and 26, and 28 U.S.C. § 1391.

## THE PLAINTIFFS

18.     Each Plaintiff named herein below is an individual and a citizen of the state listed as the address for each such Plaintiff, and in the four years prior to the filing of this action, each Plaintiff was either a borrower/consumer of a loan or credit card with a LIBOR interest rate or has been threatened with injury as a result of the LIBOR rate:

Mary Katherine Arcell, New Orleans, LA

1  Keith Dean Bradt, Reno, NV

2  Jose Brito, Reno, NV

3  Jan-Marie Brown, Reno, NV

4  Rosemary D'Augusta, San Francisco, CA

5  Brenda Davis, Dallas, TX

6  Pamela Faust, Cincinnati, OH

7  Carolyn Fjord, Sacramento, CA

8  Donald C. Freeland, Cincinnati, OH

9  Donald Frye, Colorado Springs, CO

10  Gabriel Garavanian, Nashua, NH

11  Harry Garavanian, Boston, MA

12  Yvonne Jocelyn Gardner, Colorado Springs, CO

13  Valarie Jolly, Dallas, TX

14  Michael Malaney, Grand Rapids, MI

15  Lenard Marazzo, Reno, NV

16  Lisa McCarthy, Naples, FL

17  Timothy Nieboer, Kalamazoo, MI

18  Deborah Pulfer, Sidney, OH

19  Bill Rubinsohn, Philadelphia, PA

20  Sondra Russell, Waco, TX

21  June Stansbury, Reno, NV

22  Clyde Duane Stensrud, Seattle, WA

23  Judith Ann Bray, Colorado Springs, CO

24  Gary Talewsky, Boston, MA

25  Diana Lynn Ultican, Seattle, WA

26  Christine M Whalen, New Orleans, LA

- 8 -

19.     Because some Plaintiffs are purchasers of LIBOR based interest rate loans and credit, they have been harmed and damaged in that USD LIBOR is an unlawful rate regularly utilized as a component of consumer and business loans, including mortgages, reverse mortgages,  student loans, credit cards, auto loans, lines of credit, contracts, and all varieties of financial instruments, offered and sold directly to plaintiffs by the Defendants, and by their co-conspirators, and by other banks and financial institutions that have adopted the LIBOR base rate in their financial instruments.

20.     More specifically, Plaintiff Lisa McCarthy is an authorized user with her husband on a credit card issued by the unnamed co-conspirator Capital One Financial Corporation which is an American bank holding company specializing in credit cards, auto loans, banking, and savings accounts, headquartered in McLean, Virginia with operations primarily in the United States.  It is one of  the largest banks in the United States.  The bank has 755 branches. It is ranked 99th on the Fortune 500, and conducts business in the United States, Canada, and the United Kingdom.  The company helped pioneer the mass marketing of credit cards in the 1990s.  In 2016, it was the 5th largest credit card issuer by purchase volume, after American Express, JPMorgan Chase, Bank of America, and Citigroup.  The rates charged on the Capital One credit card are based upon a 1-month LIBOR rate.  The current APR is 6.33% for January, 2022, which is the one-month LIBOR plus margin.  Capital One Credit Card lists the 1-month LIBOR rates in its statements as possible components in disclosing variable interest rates to be charged to its customers.  As a result, Plaintiff Yvonne Jocelyn Gardner has paid LIBOR based interest on this note and therefore has incurred overcharges as a result of the LIBOR price-fixing conspiracy.  She is threatened with injury as a result of the LIBOR price-fixing conspiracy to the extent the card may be used in the future.

*First Amended Complaint for Violations of §§ 1 and 2 of the Sherman Act*

21.      Plaintiff Lisa McCarthy is also a purchaser of a LIBOR-based adjustable rate mortgage through Fifth Third Mortgage Company located in Cincinnati, Ohio.  The Adjustable Rate Note is dated July 17, 2006 and tracks the LIBOR  One-Year Index as published in the Wall Street Journal, with rate caps.  The "Index" is the average of the interbank offered rates for one-year U.S. dollar-denominated deposits in the London market ("LIBOR"), as published in The Wall Street Journal.  The initial interest rate was 6.875% on a loan of $38,000.  Monthly payments started at $265.55.  Plaintiff McCarthy has paid LIBOR based interest on her adjustable rate mortgage and therefore has incurred overcharges as a result of the LIBOR price-fixing conspiracy.  On May 12, 2021, Plaintiff McCarthy was advised by Fifth Third Preferred Mortgage Company that her LIBOR based adjustable rate mortgage would be replaced by the Secured Overnight Financing Rate ("SOFR"):

> "Due to a change in market circumstances, LIBOR will cease to exist immediately after June 30, 2023.  In preparation for this change, the Federal Reserve created the Alternative Reference Rates Committee (ARRC) to select an alternative interest rate to replace LIBOR. One of the ARRC's key goals is to ensure a transition to a new rate in a manner this is fair to both borrowers and lenders.

> "ARRC selected the Secured Overnight Financing Rate (SOFR) to replace LIBOR in residential adjustable rate mortgages (ARMS).  Because LIBOR and SOFR are similar, but not identical, the SOFR interest rate has historically been lower than the LIBOR rate.  *ARRC therefore added what is referred to as a "spread adjustment" to SOFR so that the actual interest rate that borrowers pay under SOFR will be similar to the LIBOR rate.*  Please not, however, that SOFR, like LIBOR, will be subject to fluctuations.

*First Amended Complaint for Violations of §§ 1 and 2 of the Sherman Act*

"Fifth Third [bank] is preparing to follow the industry standards and move  loans that utilize LIBOR to the new SOFR rate *with the spread adjustment recommended by ARRC.*  We are currently unable to tell you the precise rate that will apply to your loan after the move to SOFR, just as we have not been able to predict a future LIBOR rate.  As noted, however, *we intend to follow ARRC's recommendation*, which is designed to be fair to banks and their borrowers as this transition occurs."  (Emphasis Added.)

22.     The ARRC is run by representatives of the banking industry.  Although ostensibly terminating the fixed LIBOR rate, the ARRC's "spread adjustment" merely continues the fixed LIBOR rate beyond its official "termination date" for USD LIBOR in the United States, and the conspiracy continues.

23.     Plaintiff Yvonne Jocelyn Gardner, who is an elderly 93 year-old, is a purchaser of a LIBOR rate based note from Defendant Bank of America.  The note was issued by Defendant Bank of America on August, 2015, in the original amount of $106,752.36.  Monthly interest payments were made to Defendant in Dallas, Texas, from the date of the making of the note.  As a result, Plaintiff Yvonne Jocelyn Gardner has paid LIBOR based interest on this note and therefore has incurred overcharges as a result of the LIBOR price-fixing conspiracy.

24.     Plaintiff Harry Garavanian is a borrower on a LIBOR based Education Refinance Loan from Citizens Bank in the original amount of $107,465.99.  Payments have been made by Plaintiff on principal and interest from the date of the making of the note.  As a result, Plaintiff Harry Garavanian has paid LIBOR based interest on his note and therefore has incurred overcharges as a result of the LIBOR price-fixing conspiracy.

*First Amended Complaint for Violations of §§ 1 and 2 of the Sherman Act*

25.     Plaintiff Jose Brito is a borrower on a LIBOR-based adjustable rate mortgage based upon the one-year LIBOR rate.  The loan in the amount of $289,000 was made through Prospect Mortgage, LLC, which located in Sherman Oaks, CA.  Plaintiff Brito has paid LIBOR-based interest on his adjustable rate mortgage since its inception on November 11, 2010, starting with monthly payments in the amount of $1,317.99, at an initial interest rate of 3.625%, and therefore has incurred overcharges as a result of the LIBOR price-fixing conspiracy.

26.     All of the Plaintiffs have been threatened with damage, in that each may be required to pay anticompetitive LIBOR rates in the future for fixed and variable interest rate loans, including mortgages, reverse mortgages, student loans, credit cards, auto loans, lines of credit, contracts, and many other varieties of financial instruments, in which the LIBOR base component has been unlawfully fixed by Defendants' unlawful combination and/or conspiracy.

27.     None of the named Plaintiffs was ever aware that the LIBOR rate that they had purchased was arrived at by agreement among the Defendant banking conspirators.  The method of calculating LIBOR was never disclosed to these Plaintiffs during the purchase of their loans or the application for their credit.  The fact that the LIBOR rate was arrived at by agreement among a panel of banks who were supposed to compete on rates was never overtly disclosed to Plaintiffs, nor indeed was it disclosed to the public in general, nor even was it know to the majority of banking executives charged with responsibility at their respective banks to sell loans and credit.  The arcane process of arriving at an agreed LIBOR rate was consummated in virtual secret and known only to a limited cadre of cognoscenti in the rarefied echelons of the banking industry.  Not even when the New York LIBOR case in *Gelboim* was first filed was there any realistic public awareness of the price-fixing nature of the LIBOR

process, since the *Gelboim* case dealt with a separate, independent price fixing conspiracy within the LIBOR process.

28.     As a result, it is not possible to conclude that any Plaintiff, or for that matter, any normal, non-banking-professional American citizen, could ever have imagined that the Defendants in this case have been fixing the price they charged for LIBOR interest rates since 1986.  The existence and effect of the LIBOR price fixing agreement was known only to the banking industry insiders who used the LIBOR rate in their businesses and who participated in its conception and agreement.  It was not known generally by the public, and certainly not by the Plaintiffs.

29.     Although the government has yet to institute any proceedings against this anti-competitive activity, the government failure to enforce the antitrust laws is simply bell-weather for viability of an action.  It is yet another glaring example of the reason why Congress sought to insure that the public would have the right to sue for antitrust violations. Government inaction is the poster illustration of why private enforcement has been recognized by the Supreme Court as part of the Congressional plan to enforce the antitrust laws.  Neither government action nor inaction is a pre-condition to the filing of private antitrust litigation.

30.     The specific intent of the Defendant as co-conspirators in their agreement to set and published LIBOR rates was to promulgate agreed-upon non-competitive rates that would be exploited by their banks, by other banks, and by financial institutions throughout out the world, but particularly in the United States with respect to USD LIBOR.  The Defendants all had the specific intent to set the LIBOR rates according to the formula and the LIBOR code which they knew was designed to insure a profit over an otherwise competitive market rate.

31.     The nature and directness of the plaintiff's claimed injury is that they paid the overcharge. Defendants targeted the sale of LIBOR based financial products to the United

- 13 -

States.  Adherence to the LIBOR rate is a "key priority" to Defendants according to the minutes of the LIBOR Trade Association Working Party Meeting held on May 2, 2019. Moreover, "each Contributor Bank's Submitters and their direct managers must acknowledge in writing that they have read the code of conduct [which requires the submission of rates for calculation of the LIBOR formula] and that they will comply with it."  The Defendants have admitted in declarations submitted in this case that subsidiaries, branches or companies related to Defendants submitted rate information to ICE for the specific purpose of setting LIBOR rates.  The injury that has been suffered by Plaintiffs – or that threatens the Plaintiffs in the future – is precisely the type of injury that the antitrust laws were designed to prevent.  Plaintiffs above are direct purchasers of financial instruments that contain a price-fixed rate that has agreed to by these Defendants and that was intended to be sold to these Plaintiffs.  Section 4 of the Clayton Act provides an remedy regardless of the amount of the damages involved and Section 16 of the Act permits injunctive relief as a remedy for those threatened with damage.  Injunctive relief may take the form of disgorgement of profits to the government and divestiture.

32.     There is no risk of duplicative recovery.  There is no risk of duplicative recovery since only these Plaintiffs have paid the overcharge in the LIBOR rate.

33.     The complexity of apportionment does not exist because each Plaintiff is entitled to the difference between the actual rate they paid in interest and the lowest submission.  There is no need to apportion the potential overcharge damages since 100% of the damages flow through to the Plaintiffs.  These Plaintiffs are the end-payors of the interest rate overcharge.

34.     The damages are not speculative because they can be easily calculated by the difference between the actual rate paid and the lowest submission rate.  Plaintiffs' damages are not speculative in the least since there is a sound basis upon which to calculate the difference between a competitive interest rate against the actual LIBOR rates.  This amount can easily be calculated

*First Amended Complaint for Violations of §§ 1 and 2 of the Sherman Act*

for each and every LIBOR setting, for each and every day that LIBOR was published by Defendants.

35.     Plaintiffs are appropriate plaintiffs because plaintiffs paid the illegal price. Plaintiffs paid the actual LIBOR interest but should have paid the lowest submission. Although there are many potential plaintiffs who have suffered from the LIBOR overcharge, these named Plaintiffs are equally capable of prosecuting this claim against Defendants as are any others.  As has been set out above, these Plaintiffs have entered into loans and other financial obligations that were tied to the LIBOR rate; Plaintiffs have made payments that were tied to the LIBOR rate; Plaintiffs have alleged and will allege infra that the LIBOR rate that was paid was higher than what a competitive rate would have been in the absence of the LIBOR formula and methodology.

## THE DEFENDANTS

36.     Defendant Intercontinental Exchange Inc. ("ICE") is a Delaware corporation with its principal place of business at 5660 New Northside Drive, Atlanta, Georgia 30328, registered to do business in California.  Intercontinental Exchange, Inc. is dual-headquartered in Atlanta and New York.

37.     Defendant ICE Benchmark Administration Limited (f/k/a NYSE Euronext Rate Administration Limited, hereinafter "IBA") is a UK company with a registered address of Milton Gate, 60 Chiswell Street, London, EC1Y 4SA, United Kingdom. NYSE Euronext Rate Administration Limited was renamed ICE Benchmark Administration Limited after Intercontinental Exchange, Inc.'s acquisition of NYSE Euronext in 2013. After the acquisition, four of NYSE Euronext's directors joined ICE's 14-member board.

38.     Defendant Intercontinental Exchange Holdings, Inc. is a Delaware corporation

*First Amended Complaint for Violations of §§ 1 and 2 of the Sherman Act*

with its principal place of business at 5660 New Northside Drive, Atlanta, Georgia 30328, registered to do business in California.

39.     Defendant ICE Data Services, Inc. ("ICE Data Services") is a Delaware corporation registered to do business in California, with a principal place of business located at 100 Church Street, 11th Floor, New York, New York 10007. ICE Data Services owns and operates the ICE Report Center, which houses USD ICE LIBOR data and with which registration is required to access certain USD ICE LIBOR rate and submission data from ICE.

40.     Defendant ICE Pricing and Reference Data LLC ("ICE Pricing and Reference Data") is a Delaware company registered to do business in California with a principal place of business located at 5660 New Northside Drive, Atlanta, Georgia 30328.

41.     The ICE entities (hereinafter, the ICE entities shall be collectively referred to as "ICE", when not referenced individually) and its other unnamed subsidiaries and affiliates share a unity of corporate interest and operate as a single enterprise in furtherance of the combination and conspiracy alleged herein.

42.     Each Bank Defendant named below is one of the Panel Banks contributing rate data to ICE for calculation of the USD LIBOR benchmark rate.

43.     Defendant Bank of America, N.A. is a national banking association, and Defendant Bank of America Corporation, a Delaware corporation (collectively, "Bank of America"). Both entities headquarters are located at 100 North Tryon Street, Charlotte, North Carolina 28202 and are registered to do business in California.  Bank of America and its other unnamed subsidiaries and affiliates share a unity of corporate interest and operate as a single enterprise in furtherance of the combination and conspiracy alleged herein.

44.     Defendant Barclays Bank, plc, is a U.K. public limited company with its principal place of business at 1 Churchill Place, London E14 5H, United Kingdom, and

operates a New York branch at 745 Seventh Avenue, New York, New York 10019, and

Defendant Barclays Capital Inc. is a Connecticut corporation with its principal place of

business at 745 Seventh Avenue, New York, New York 10019 (collectively, "Barclays").

Barclays and its other unnamed subsidiaries and affiliates share a unity of corporate interest

and operate as a single enterprise in furtherance of the combination and conspiracy alleged

herein.  Barclays' employees and those persons employed by Barclay's American subsidiaries

have provided information to Barclays Bank, plc for the purpose of setting the daily USD

LIBOR  rates.

45.     Defendant Citibank, N.A. is a federally chartered national banking Association,

and Defendant Citigroup Inc. is a Delaware corporation. Both entities are headquartered at 399

Park Avenue, New York, New York 10022. Defendant Citigroup Global Markets Inc. is a

Delaware corporation headquartered at 390-388 Greenwich Street, New York, New York

10013 and registered to do business in California (hereinafter, the Citibank/Citigroup entities

shall be referred to collectively as "Citibank" if not referred to individually).  Citibank and its

other unnamed subsidiaries and affiliates share a unity of corporate interest and operate as a

single enterprise in furtherance of the combination and conspiracy alleged herein.

46.     Defendant Coöperatieve Rabobank U.A. ("Rabobank") is a bank organized

under the laws of Netherlands with its principal place of business at Croeselaan 18, 3521 CB

Utrecht, Netherlands, and operates a New York branch at 245 Park Avenue, 37th Floor, New

York, New York 10167. Rabobank and its other unnamed subsidiaries and affiliates share a

unity of corporate interest and operate as a single enterprise in furtherance of the combination

and conspiracy alleged herein.  Rabobank's employees and those persons employed by

Rabobank's American branch offices have provided information to Rabobank for the purpose

of setting the daily USD LIBOR  rates.

*First Amended Complaint for Violations of §§ 1 and 2 of the Sherman Act*

47.     Defendant Credit Suisse Group AG is a Swiss aktiengesellschaft ("AG" or "CSGAG") with its principal place of business at 8 Paradeplatz, 8001 Zurich, Switzerland. Defendant Credit Suisse AG is a Swiss AG with its principal place of business at Ueltibergstrasse 231, 8070 Zurich, Switzerland.  Credit Suisse AG is registered to do business in California and it operates a New York branch located at Eleven Madison Avenue, 24th Floor, New York, New York 10010.  Defendant Credit Suisse Securities (USA) LLC is a Delaware limited liability company.  It is registered to do business in California, with its principal place of business at Eleven Madison Avenue, 24th Floor, New York, New York 10010 (hereinafter, the Credit Suisse entities will be referred to collectively as "Credit Suisse"). Credit Suisse and its other unnamed subsidiaries and affiliates share a unity of corporate interest and operate as a single enterprise in furtherance of the combination and conspiracy alleged herein.  Credit Suisse Group AG operates subsidiaries that are located in and do business in the United States.  As of November 19, 2020, CSGAG's subsidiaries had 7,447 employees in the Unites States of which 147 were in California.  In the United States, CSGAG itself has a New York branch and two representative offices in California.  In the United States, CSGAG itself employed 112 people in the New York Branch.  CSGAG's direct employees and those employed by CSGAG's American subsidiaries provided information to CSGAG for the purpose of setting the daily LIBOR USD rates.

48.     Defendant Deutsche Bank AG is a German aktiengesellschaft with its principal place of business at Taunusanlage 12, Frankfurt, 60325, Germany.  Defendant Deutsche Bank AG is registered to do business in California, and it operates a San Francisco branch at 101 California Street, San Francisco, CA  94111. Defendant Deutsche Bank Securities Inc. ("DBSI") is a Delaware corporation registered to do business in California, with its principal place of business at 60 Wall Street, 4th Floor, New York, New York 10005 (hereinafter, the

Deutsche Bank entities shall be referred to collectively as "Deutsche Bank" when not referenced individually).  Deutsche Bank and its other unnamed subsidiaries and affiliates share a unity of corporate interest and operate as a single enterprise in furtherance of the combination and conspiracy alleged herein.  Deutsche Bank AG's employees and those persons employed by Deutsche Bank AG's American branch offices and subsidiaries have provided information to Deutsche Bank AG for the purpose of setting the daily USD LIBOR rates.

49.     Defendant HSBC Holdings plc is a British public limited company with its principal place of business at 8 Canada Square, London, E14 5HQ, United Kingdom. Defendant HSBC Bank plc is a British public limited company with its principal place of business at 8 Canada Square, London, E14 5HQ, United Kingdom. Defendant HSBC Bank USA, N.A. is a national banking association headquartered at HSBC Tower, 452 Fifth Avenue, New York, New York 10018 and registered to do business in California. Defendant HSBC Securities (USA) Inc. is a Delaware corporation registered to do business in California, with its principal place of business at HSBC Tower, 452 Fifth Avenue, New York, New York 10018 (hereinafter, the HSBC entities shall be referred to collectively as "HSBC" if not referenced individually).  HSBC and its other unnamed subsidiaries and affiliates share a unity of corporate interest and operate as a single enterprise in furtherance of the combination and conspiracy alleged herein.  HSBC Bank plc's employees and those persons employed by HSBC Bank plc's American branch offices and subsidiaries have provided information to HSBC Bank plc for the purpose of setting the daily USD LIBOR  rates.

50.     Defendant JPMorgan Chase & Co. is a Delaware corporation with its principal place of business at 270 Park Avenue, New York, New York 10017.  Defendant JPMorgan Chase Bank, N.A. is a federally-chartered national banking association registered to do

business in California, headquartered at 270 Park Avenue, New York, New York 10017. Defendant J.P. Morgan Securities LLC is a Delaware limited liability company registered to do business in California, with its principal place of business at 277 Park Avenue, New York, New York 11072 (hereinafter, the JPMorgan Chase entities shall be referred to collectively as "JP Morgan" if not referenced individually).  JP Morgan and its other unnamed subsidiaries and affiliates share a unity of corporate interest and operate as a single enterprise in furtherance of the combination and conspiracy alleged herein.

51.     Defendant Lloyds Bank plc is a British public limited company with registered offices at 25 Gresham Street, London EC2V 7HN, United Kingdom, and it operates a New York branch at 1095 Sixth Avenue, New York, New York 10036. Defendant Lloyds Securities Inc. is a Delaware corporation headquartered at 1095 Sixth Avenue, New York, New York 10036 (hereinafter, the Lloyds entities shall be referred to collectively as "Lloyds" if not referenced individually).  Lloyds and its other unnamed subsidiaries and affiliates share a unity of corporate interest and operate as a single enterprise in furtherance of the combination and conspiracy alleged herein.  Lloyds Bank plc's employees and those persons employed by Lloyds Bank plc's American branch offices and subsidiaries have provided information to Lloyds Bank plc for the purpose of setting the daily USD LIBOR  rates.

52.     Defendant MUFG Bank, Ltd. is a bank organized under the law of Japan with its principal place of business at 7-1, Marunouchi 2-chome Chiyoda-ku, Tokyo 100-8388, Japan.  MUFG Bank, LTD is registered to do business in California and operates a New York branch at 1251 Sixth Avenue, New York, New York 10020 and a San Francisco Branch at 350 California Street, 1st Floor, San Francisco, CA  94104. Defendant The Bank of Tokyo-Mitsubishi UFJ Ltd. is a bank organized under the laws of Japan with its principal place of business at 7-1, Marunouchi 2-chome Chiyoda-ku, Tokyo 100-8388, Japan and which

operates a New York branch at 1251 Sixth Avenue, New York, New York 10020. Defendant Mitsubishi UFJ Financial Group Inc. is a Japanese corporation with its principal place of business at 7-1, Marunouchi 2-chome Chiyoda-ku, Tokyo 100-8388, Japan. Defendant MUFG Securities Americas Inc. is a Delaware corporation registered to do business in California, with its principal place of business at 1221 Avenue of the Americas, 6th Floor, New York, New York 10020 (hereinafter, all four MUFG entities shall be referred to collectively as "MUFG" if not referenced individually). MUFG and its other unnamed subsidiaries and affiliates share a unity of corporate interest and operate as a single enterprise in furtherance of the combination and conspiracy alleged herein.  MUFG Bank Ltd's employees and those persons employed by MUFG Bank Ltd's American branch offices and subsidiaries have provided information to MUFG Bank Ltd for the purpose of setting the daily USD LIBOR rates.

53.     Defendant Royal Bank of Scotland Group plc is a United Kingdom public limited company with its principal place of business at 1000 Gogarburn, Edinburgh, EH12 1HQ, Scotland.  Defendant Royal Bank of Scotland plc is a United Kingdom public limited company with its principal place of business located at 36 St. Andrew Square, Edinburgh, EH2 2YB, Scotland, and it operates a Connecticut branch located at 600 Washington Boulevard, Stamford, Connecticut 06901. Defendant National Westminster Bank plc is a U.K. public limited company with its principal place of business at 135 Bishopsgate, London, EC2M 3UR, United Kingdom. Natwest is a member of the USD LIBOR Panel.  Defendant Natwest Markets Securities Inc. (f/k/a RBS Securities Inc.) is a Delaware corporation registered to do business in California, with its principal place of business at 600 Washington Boulevard, Stamford, Connecticut 06901 (hereinafter the Royal Bank of Scotland and National Westminster entities shall be referred to collectively as "Royal Bank of Scotland" or

*First Amended Complaint for Violations of §§ 1 and 2 of the Sherman Act*

"RBS" when not referenced individually). RBS and its other unnamed subsidiaries and affiliates share a unity of corporate interest and operate as a single enterprise in furtherance of the combination and conspiracy alleged herein.  National Westminster Bank plc's employees and those persons employed by National Westminster Bank plc's American branch offices and subsidiaries have provided information to National Westminster Bank plc for the purpose of setting the daily USD LIBOR rates.

54.     Defendant Sumitomo Mitsui Banking Corporation is a bank organized under the laws of Japan with its principal place of business at 1-1-2, Marunouchi, Chiyoda-ku, Tokyo, Japan.  Defendant Sumitomo Mitsui Banking Corporation is registered to do business in California, and it operates a San Francisco branch at 555 California Street, Suite 3350, San Francisco, CA  94104, and a New York branch at 277 Park Avenue, New York, New York 10172.  Defendant Sumitomo Mitsui Financial Group Inc. is a Japanese corporation organized under the laws of Japan with its principal place of business at 1-1-2, Marunouchi, Chiyoda-ku, Tokyo, Japan. Defendant Sumitomo Mitsui Banking Corporation Europe Ltd. is a U.K. public limited company with its principal place of business at Temple Court, 11 Queen Victoria Street, London, EC4N 4TA, United Kingdom. SMBC Capital Markets, Inc. is a Delaware corporation registered to do business in California, with its principal place of business at 277 Park Avenue, New York, New York 10172 (hereinafter the Sumitomo entities shall be referred to collectively as "Sumitomo" if not referenced individually).  Sumitomo and its other unnamed subsidiaries and affiliates share a unity of corporate interest and operate as a single enterprise in furtherance of the combination and conspiracy alleged herein.  Sumitomo Mitsui Banking Corporation Europe Ltd.'s employees and those persons employed by Sumitomo Mitsui Banking Corporation Europe Ltd.'s American branch offices and subsidiaries have

provided information to Sumitomo Mitsui Banking Corporation Europe Ltd. for the purpose of setting the daily USD LIBOR rates.

55.     Defendant UBS Group AG is a Swiss AG with principal places of business at 45 Bahnhofstrasse, Zurich CH-8098, Switzerland and 1 Aeschenvorstadt, Basel CH-4051, Switzerland. Defendant UBS AG is a Swiss AG with principal places of business at 45 Bahnhofstrasse, Zurich CH-8098, Switzerland and 1 Aeschenvorstadt, Basel CH-4051, Switzerland and it operates a Connecticut Branch at 677 Washington Boulevard, Stamford, Connecticut 06901. Defendant UBS Securities LLC is a Delaware limited liability company registered to do business in California, with its principal place of business at 1285 Avenue of the Americas, New York, New York 10019 (hereinafter, the UBS entities shall be referred to collectively as "UBS" if not referenced individually).  UBS and its other unnamed subsidiaries and affiliates share a unity of corporate interest and operate as a single enterprise in furtherance of the combination and conspiracy alleged herein.  UBS Group AG reported a group total worldwide operating income of approximately $32.4 billion for 2020, of which its Unites States operating income comprised approximately $11.7 billion.  UBS Group AG's direct employees and those employed by UBS Group AG's American subsidiaries provided information to UBS Group AG for the purpose of setting the daily LIBOR USD rates.

Personal Jurisdiction over the Foreign Co-Conspirator Defendants

56.     The foreign Defendants named above are:  ICE Benchmark Administration Limited ("IBA"), Barclays Bank PLC, Coöperatieve Rabobank U.A., Credit Suisse Group AG, Credit Suisse AG, Deutsche Bank AG, HSBC Holdings plc, HSBC Bank plc, Lloyds Bank plc, MUFG Bank, Ltd., The Bank of Tokyo- Mitsubishi UFG Ltd., Mitsubishi UFJ Financial Group, Inc., Royal Bank of Scotland Group plc, Royal Bank of Scotland plc, National Westminster Bank plc, Sumitomo Mitsui Banking Corporation, Sumitomo Mitsui

Financial Group Inc., Sumitomo Mitsui Banking Corporation Europe Ltd., UBS Group AG, and UBS AG.

57.     As a part of the anticompetitive conspiracy to fix the LIBOR base rate, each of these Defendants agreed to submit its proposed interest rates to ICE for the purpose of calculating the agreed-upon USD LIBOR trim average that would be offered to their customers, and to customers of their United States subsidiaries, and that would be published specifically for use by other United States financial institutions and banks and credit card companies to sell loans and credit within the United States.  Some 40 percent of all financial transactions worldwide are done in dollars.[3]  As a result, it is only stating the obvious to allege that the foreign Defendants knew that their published LIBOR rate would be used by their own banks and other banks and financial institution within the United States and also that these Defendants indeed targeted the United States' market for the implementation of their LIBOR base rate.

58.     In addition, because the trim-average by definition eliminates what otherwise would have been lower rates from at least 4 of the panel banks, but for the agreement, Defendants could have offered consumers and purchasers of loans and credit in the United States a choice of USD short-term interest-rates, and consumers in the United States could have opted for alternative lower interest rates than those which were ultimately offered as  the USD LIBOR base rate.  But for the conspiracy, consumers and purchasers of loans in the United States could have chosen not to enter into LIBOR-based transactions at all.  And, absent the Defendants' agreement not to offer alternate benchmark rates in their lending packages, United States consumers could have moved toward an alternative benchmark rate

---

[3] *New York Times*, A Strong Dollar Will Inflict Pain in Many Nations, September 27, 2022.

such as the New York Funding Rate.  In other words, but for the Defendants' United States related contacts and but for Defendants' specific targeting of the United States market, Defendants' conspiracy could not have succeeded.

59.     To bolster the false perception that USD LIBOR served its intended purpose of facilitation (which was critical to maintaining USD LIBOR's dominance), Defendants dispatched representatives to the United States to "placate" U.S. investors.  Defendants were particularly concerned about "the US market" and agreed that they needed to "manage the [New York] Fed's perception on LIBOR" and needed to reach consensus on a "way to defend" USD LIBOR. During the entire period that LIBOR rates have been offered, there have been numerous contacts between The British Bankers Association ("BBA") and the NY Fed regarding LIBOR. (Declaration of Lisa Kaas (Dec. 8, 2014), Doc. No. 892 ("Kaas Decl.") ¶¶ 25, 35-37; IN RE LIBOR-BASED FINANCIAL INSTRUMENTS ANTITRUST LITIGATION MDL No. 2262, Master File No. 1:11-md-02262-NRB.)

60.     Ultimately, Defendants' conspiratorial conduct and extraterritorial actions were specifically directed at and produced harmful effects in the U.S. in an attempt to prevent the United States banks from using any other guideline or benchmark other than LIBOR.  In fact, the panel banks who are defendants in this case have agreed not to use alternative benchmarks other than LIBOR.

61.     Defendants do not deny that it was their intentional communication of individual USD LIBOR trim rates to United States consumers and businesses, both by them and through their subsidiary banks and corporations, that ultimately facilitated the sale of financial products to U.S. consumers based on LIBOR, which was their overriding purpose

*First Amended Complaint for Violations of §§ 1 and 2 of the Sherman Act*

and intent.  The foreign defendants clearly intended that their agreed LIBOR rate would affect the rates charged for loans and credit in the United States.

62.     This Court has determined that the relevant forum for the assessment of minimum contacts is the United States as a whole.  Defendants can avail themselves of a particular forum such as the United States by reason of actions taken by con-conspirators within the forum, essentially operating on behalf of each member of the conspiracy. *Copperweld Crop v. Independent Tube Corp*, 467 U.S. 752, 769 (1984).  Many of the foreign defendant names above have subsidiaries acting for them within the United States.  Such a subsidiary is considered to be unitary with the foreign parent for purposes of the antitrust laws.

63.     In this case, bank executives and managers of the Defendant foreign banks' subsidiaries in the United States manipulated and made decisions concerning LIBOR policy and sales in the United States at the direction of the foreign Defendants.  If permitted discovery, Plaintiffs will prove that American subsidiaries would regularly submit information to their foreign defendant parents for the purpose of calculating the daily interest submissions that that foreign defendant panel bank would make to ICE LIBOR for the purpose of calculating the daily USD LIBOR base rates.

## The Defendants Targeted the United States Market

64.     Barclays has admitted through requests for admissions in this case that 1) it has engaged in transactions in the United States that reference USD; 2) that it agreed to abide Code of Conduct which set administered the formula to set the USD ICE LIBOR rate; 3) that it knew USD ICE LIBOR was a benchmark rate referenced in financial transactions that was used in the United States during the Relevant Period; and 4) that it is not aware of any congressional immunity for the bank with regard to LIBOR.

65.     Bank of America has admitted through requests for admissions in this case that 1) it has signed the ICE LIBOR Code of Conduct and agreed to the procedures set forth therein; 2) that it is "aware" that some contracting parties in the United States have entered into contracts that reference USD ICE LIBOR during the Relevant Period; 3) it engaged in financial transactions that reference USD ICE LIBOR in the United States during the Relevant Period; 4) during the Relevant Period it engaged in variable rate loans in the United States that reference USD ICE LIBOR; 5) that it is not aware of any congressional immunity for the bank with regard to LIBOR.

66.     Citibank has admitted through requests for admissions in this case that 1) it has agreed to abide by the ICE LIBOR Code of Conduct and agreed to the procedures set forth therein; 2) that it knew USD ICE LIBOR was a benchmark rate referenced in financial transactions that was used in the United States during the Relevant Period; 3) it engaged in financial transactions that reference USD ICE LIBOR in the United States during the Relevant Period; 4) during the Relevant Period it engaged in variable rate loans in the United States that reference USD ICE LIBOR; 5) that it is not aware of any congressional immunity for the bank with regard to LIBOR; 6)  it issued credit cards in the United States, the terms of which reference the USD ICE LIBOR benchmark interest rate, during the Relevant Period, but CBNA otherwise denies this Request.

67.     Credit Suisse has admitted through requests for admissions in this case that 1) it has agreed to abide by the ICE LIBOR Code of Conduct and agreed to the procedures set forth therein; 2) it engaged in financial transactions that reference USD ICE LIBOR in the United States during the Relevant Period; 3) it knew that there were loans and financial instruments in the United States based on contracts that reference USD ICE LIBOR; and 4) that it is not aware of any congressional immunity for the bank with regard to LIBOR.

*First Amended Complaint for Violations of §§ 1 and 2 of the Sherman Act*

68.     Deutsche Bank has admitted through requests for admissions in this case that 1) it engaged in financial transactions that incorporate or reference USD ICE LIBOR in the United States during the Relevant Period; 2) it agreed to comply with the USD LIBOR® Code of Conduct issued by IBA that sets out the framework within which USD LIBOR Contributor Banks are expected to operate; 3) it is aware that some financial institutions in the United States use published USD ICE LIBOR rates as benchmarks for determining interest rates on loans and various financial instruments, including swaps; 4) it engaged in transactions in the United States that reference USD ICE LIBOR during the Relevant Period; 5) that it is not aware of any congressional immunity for the bank with regard to LIBOR; and 6) it has engaged in financial transactions in the United States that included a variable interest rate linked to USD ICE LIBOR.

69.     HSBC has admitted through requests for admissions in this case that 1) during the Relevant Period, it was a panel bank for USD ICE LIBOR; 2) it entered into contracts in which an interest rate would be calculated, in part, by reference to the USD ICE LIBOR benchmark; 3) during the Relevant Period, it anticipated that the USD ICE LIBOR benchmarks could be referenced by banks in the United States in loans or other financial instruments; 4) HSBC Bank engaged in financial transactions in the United States based on contracts that reference USD ICE LIBOR; 5) during the Relevant Period, it had not received immunity from the United States Congress to "fix" USD ICE LIBOR; and 6) it included USD ICE LIBOR in the calculation of the interest rate charged on at least one variable rate loan in the United States.

70.     Lloyds Bank has admitted through requests for admissions in this case that 1) Lloyds Bank admits that it engaged in transactions in the United States that referenced USD ICE LIBOR during the Relevant Period; 2) Lloyds Bank agreed to abide by the ICE LIBOR

Code of Conduct during the Relevant Period, but Lloyds Bank otherwise denies this Request; 3) Lloyds Bank admits that it engaged in transactions in the United States that reference USD ICE LIBOR during the Relevant Period; and 4) Lloyds Bank is not aware of any statute enacted by the United States Congress that expressly grants or excludes antitrust immunity for a panel bank's participation in the submission process for determining USD ICE LIBOR.

71.     JPMorgan has admitted through requests for admissions in this case that 1) JPMorgan Chase Bank, N.A., London Branch is a member of the USD ICE LIBOR panel; 2) certain contractual interest rates for certain financial transactions involving JPMorgan and certain counterparties in the United States between 2014 and 2020 referenced the USD ICE LIBOR benchmark rate; 3) JPMorgan has agreed to abide by the USD ICE LIBOR Code of Conduct to make submissions to IBA, on each London business day, that IBA states it uses, together with submissions by other USD ICE LIBOR panel banks, to calculate USD ICE LIBOR in accordance with IBA's published USD ICE LIBOR Methodology; 4) USD ICE LIBOR was referenced as a benchmark in certain JPMorgan variable rate loan transactions with certain non-Plaintiff consumers located in the United States of America between 2014 and 2020; 5) certain contractual interest rates for certain financial transactions involving JPMorgan and certain counterparties in the United States between 2014 and 2020 referenced the USD ICE LIBOR benchmark rate; 6) it is unaware of any legislation or regulation enacted by the United States Congress expressly granting it, or any other USD ICE LIBOR panel bank, "immunity … to fix USD ICE LIBOR";  and 7) it referenced USD ICE LIBOR as a benchmark in certain variable rate loan transactions with certain non-Plaintiff consumers located in the United States of America between 2014 and 2020.

72.     MUFG has admitted through requests for admissions in this case that 1) it is a member of the panel of banks that submit data to ICE Benchmark Administration ("IBA") for

use in the determination of USD ICE LIBOR; 2) it enters into certain types of financial

instruments with U.S.-based corporate counterparties (not individuals) that reference USD

ICE LIBOR (such as interest rate swaps); 3) has agreed to abide by the ICE LIBOR Code of

Conduct as published by IBA, which incorporates a methodology for the determination of

USD ICE LIBOR; 4) admits that it is generally aware that banks in the United States use USD

ICE LIBOR as a reference rate for some financial instruments; 5) it enters into certain types of

financial instruments with U.S.-based corporate counterparties (not individuals) that reference

USD ICE LIBOR (such as interest rate swaps); 6) it has not "received immunity from the

United States Congress to fix USD ICE LIBOR"; and 7) has agreed to abide by the ICE

LIBOR Code of Conduct as published IBA, which incorporates a methodology for the

determination of USD ICE LIBOR.

73.     Royal Bank of Scotland (National Westminster Bank plc) has admitted through

requests for admissions in this case that 1) it entered into transactions referencing USD ICE

LIBOR during the Relevant Period; 2it agreed to abide by a Code of Conduct published by the

IBA; 3) it knew that USD ICE LIBOR rates would be referenced in loans and other financial

instruments, including swaps, by banks in the United States; 4) is not aware of any legislation

or regulation enacted by the United States Congress expressly granting National Westminster

Bank plc "immunity … to fix USD ICE LIBOR;" and 5) it has referenced ICE LIBOR rates in

variable rate loans in the United States.

74.     Rabobank has admitted through requests for admissions in this case that 1) it

was one of the USD ICE LIBOR panel banks that made USD ICE LIBOR submissions to

IBA: 2)  it engaged in transactions in the United States involving financial instruments that

referenced USD ICE LIBOR; 3) it agreed to abide by the ICE LIBOR Code of Conduct in

connection with making USD ICE LIBOR submissions during Relevant Period; 4) it was

aware that banking institutions in the United States transacted in financial instruments, including loans and interest-rate swaps, that referenced USD ICE LIBOR; 5) it engaged in transactions in the United States involving financial instruments that reference USD ICE LIBOR; 5) it is not aware of any statute enacted by the United States Congress that expressly grants or excludes antitrust "immunity… to fix USD ICE LIBOR,"; and 6) USD ICE LIBOR was a component of the interest rate it charged in connection with certain variable-rate loans it issued in the United States during the Relevant Period.

75.     Sumitomo has admitted through requests for admissions in this case that 1) it was a member of the IBA's USD ICE LIBOR panel during the Relevant Period; 2) SMBC BI agreed to abide by the ICE LIBOR Code of Conduct during the Relevant Period: 3) it anticipated that the USD ICE LIBOR benchmarks could be referenced by banks in the United States in loans or other financial instruments; and 4) it is not aware of any statute enacted by the United States Congress that expressly grants or precludes antitrust immunity "to fix USD LIBOR" or for a panel bank's participation in the submission process for determining USD ICE LIBOR.

76.     UBS has admitted through requests for admissions in this case that 1) UBS AG served on the USD ICE LIBOR panel as administered by IBA during the Relevant Period; 2) UBS entered into transactions in which an interest rate would be calculated, in part, by reference to USD ICE LIBOR in the United States during the Relevant Period; 3) UBS complied with the ICE LIBOR Code of Conduct during the Relevant Period; 4) UBS understood that the USD ICE LIBOR rates may be referenced in loans and other financial instruments offered by banks in the United States during the Relevant Period; 5) UBS entered into transactions in which an interest rate would be calculated, in part, by reference to USD

ICE LIBOR in the United States during the Relevant Period; and 6) UBS has not expressly "received immunity from the United States Congress to fix USD ICE LIBOR".

77.     Some of the Defendants have already been found by a New York Court to have fixed the submissions they submitted to LIBOR.  Those cases are different from this in that this case challenges LIBOR itself. In the other LIBOR litigation pending in the Southern District of New York, recently on appeal to the Second Circuit[4], evidence and allegations have been submitted to the District Court that show that Bank executives and managers in the United States mandated that their subordinates manipulate LIBOR. Plaintiffs in that case specifically allege that a "senior UBS manager in Stamford, Connecticut issued [a] standing directive to 'submit low LIBOR contributions' for USD LIBOR, and to keep submissions in the 'middle of the pack of other banks' expected LIBOR submissions.'" These allegations are based upon UBS's admissions to the Department of Justice. Similarly,  Plaintiffs in that case have relied on emails between a senior JPMorgan Chase executive in New York and the Banks' LIBOR submitter discussing the importance of staying in "the pack" and asking the submitter to "err on the low side" when setting LIBOR. In the New York case Plaintiffs also quote an email in which a U.S.-based employee of Citibank urged the Bank's LIBOR submitter that "we should take a leadership [role] in bringing these LIBORS back to more sensible levels," "[e]xactly as we did 3-4 months back" and that the Bank's LIBOR submissions then decreased.  Plaintiffs also asserted that a Barclays' executive "who was based in New York . . . has admitted that he instructed subordinates to submit artificially low USD LIBOR rates."

---

[4] *Schwab Short-Term Bond Mkt. Fund v. Lloyds Banking Grp.*, 22 F.4th 103 (2d Cir. 2021).

78.     Additional allegations were made in the New York proceedings that U.S. based requests were made to foreign defendants from upper management at U.S. JPMorgan Chase.

79.     All of these factual allegations were made notwithstanding the fact that the foreign Defendants had made averments in their executives' declarations submitted to that District Court, as was done in this District Court, stating that "they did not determine or transmit their LIBOR submission from the United States."

80.     In the present case, as in the New York case, the conspiratorial contacts were of the sort for which the foreign defendants should reasonably have anticipated being hailed into court as a result.

81.     Moreover, clearly, the overt acts perpetrated by the foreign defendants were foreseeable to the foreign defendants since the conspiracy that Plaintiff has alleged involves the manipulation and agreement upon USD LIBOR rates with conspirators who are based in the United States.

82.     Plaintiff further alleges that the personal jurisdiction of the foreign defendants is warranted based upon the fact that the foreign Defendants have sold trillions of dollars of LIBOR-based instruments in the United States and have purposely exploited the United States markets for USD LIBOR based financial products and have targeted the United States with their LIBOR price fixing conspiracy.

83.     These Defendants purposefully directed their activities towards residents of the United States, purposefully and intentionally directed their conduct into the United States and purposefully availed themselves of the privilege of conducting activities in the United States. Foreign Defendants knew or should have known that their anticompetitive conduct would harm Plaintiffs and others in the United States who purchased LIBOR related loans and credit.

Defendants should have known that even though their acts may have been taken outside of the United States, those acts would certainly have an effect within the United States. And would harm these Plaintiffs here.

84.     Defendants intentionally published their LIBOR rates in the United States and by doing so have intentionally placed these rates in the stream of commerce knowing that they would reach and affect the financial instruments sold in the United States.

85.     In turn, Plaintiffs' claims arise out of and relate to the anticompetitive activities perpetrated by the Defendants in fixing the price of the USD LIBOR rates.

86.     All of the foreign Defendants United States subsidiaries aided in the publication, promulgation, implementation and sale of the USD LIBOR rates in the United States on behalf of their parent companies.  The foreign Defendants and their U.S. Subsidiaries and related companies acted as one and therefore the acts of the American subsidiaries within the United States are deemed the acts of the foreign parent under *Copperweld*, supra.

## **CO-CONSPIRATORS**

87.     Various persons, partnerships, firms, banks, credit card companies and corporations not named as Defendants in this lawsuit, and individuals, the identities of which are presently unknown, have participated as co-conspirators with Defendants in the offense alleged in this Complaint, and have performed acts and made statements in furtherance of the illegal combination and conspiracy.  The unreasonable restraint of trade in this case is the hub-and-spoke price fixing agreement between and among ICE, the Defendant Contributor Panel Banks, and virtually every other bank in the United States using LIBOR as a component of interest charged in its fixed and variable interest rate loans and credit. By perpetuating this arrangement, the banks collectively have ceded power and authority to ICE and to the

*First Amended Complaint for Violations of §§ 1 and 2 of the Sherman Act*

Defendant banks to set, implement, and enforce a horizontal price-fixing restraint in which they are knowing participants.

## **FACTUAL BACKGROUND**

THE ORIGINAL BRITISH BANKERS' ASSOCIATION LIBOR

88.      LIBOR is a creature of the British Bankers' Association.  The British Bankers' Association ("BBA") is the leading trade association for the financial-services sector in the United Kingdom.[5]

89.      When BBA administered LIBOR, it was a private association that was operated without regulatory or government oversight and was governed by senior executives from its member banks.

90.      The BBA began setting LIBOR on January 1, 1986, using separate panels for different currencies.  The U.S. Dollar ("USD") LIBOR panel was composed of as many as 16-18 member banks of the BBA.

91.      Under the BBA LIBOR regime, the daily USD LIBOR was set by surveying the 16 panel bank members. Each panel bank member was asked, "At what rate could you borrow funds, were you to do so by asking for and then accepting inter-bank offers in a reasonable market size just prior to 11 a.m.?" Each bank was to respond on the basis of (in part) its own research, and its own credit and liquidity risk profile. Thomson Reuters later compiled these submissions and published them on behalf of the BBA. The final LIBOR was the mean of the eight submissions left after excluding the four highest submissions and the four lowest.[6]  The daily submission of each bank was to remain confidential until after LIBOR

---

[5] *Gelboim*, 823 F.3d at 765.
[6] *Gelboim*, 823 F.3d at 765-766.

*First Amended Complaint for Violations of §§ 1 and 2 of the Sherman Act*

was finally computed and published; and all 16 individual submissions were to be published along with the final daily rate and would thus be "transparent on an *ex post* basis."[7]

92.     Between 2007 and 2012, investigations revealed that the panel member banks had intentionally manipulated and conspired to fix LIBOR rates.  A number of panel member banks paid substantial fines for their participation in the conspiracy, including UBS, Barclays, RBS, Rabobank, Deutsche Bank, and JPMorgan Chase, among others.

93.     Over the last decade, LIBOR has navigated multiple scandals and crises and in December of 2021 LIBOR announced that it would no longer be used to issue new loans in the United States as of June, 2023.  It is being phased out due in large part due to the manipulation in rate setting by many of the banks and due to its contribution to the financial crises of 2008.

94.     Because rates for Credit Default Swaps were set using LIBOR, these derivative investments were used to insure against defaults on subprime mortgages.  When these credit default swaps began to fail, the crises was exacerbated by LIBOR since every day LIBOR rate setting banks estimated higher and higher interest rates, causing LIBOR to  rise and making loans more expensive.  With rates on trillions of dollars of financial products soaring day after day, LIBOR transmitted the crisis to all parts of the global economy and markets crashed.

95.     In 2012 an investigation uncovered a widespread scheme by certain of the panel banks – Barclays, Deutsche Bank, Rabobank, UBS and the Royal Bank of Scotland - to manipulate the LIBOR rates for profit.

96.     On September 25, 2012, it was announced publicly that the BBA was preparing to hand over administration of LIBOR to UK regulators.[8]

---

[7] *Gelboim*, 823 F.3d at 766.
[8] https://www.wsj.com/articles/SB10000872396390444180004578018371243449916

*First Amended Complaint for Violations of §§ 1 and 2 of the Sherman Act*

97.     Due to these scandals and illegal conduct and because the LIBOR rate is not reliable, SOFR has been designated to replace LIBOR in USD transactions.  The replacement is due to be completed in June of 2023 when LIBOR is scheduled to stop USD publication. The SOFR index comprises the weighted average of the rates charged on trades of Treasury bond repurchase agreements.

## DEFENDANTS' UNLAWFUL COMBINATION AND CONSPIRACY TO FIX PRICES ON USD LIBOR-BASED INTEREST RATE LOANS AND CREDIT CARDS AND CONSPIRACY TO MONOPOLIZE

98.     On February 1, 2014, the Intercontinental Exchange Benchmark Administration Limited ("IBA") took over managing LIBOR, changing it to the ICE LIBOR.

99.     LIBOR is now calculated and published by IBA on London business days for 5 currencies with 7 maturities quoted for each - ranging from overnight to 12 months, producing 35 rates, at 11:55 am London time on each applicable London business day.[9]

100.    Each LIBOR calculation is currently based on input data contributed by a panel of between 11 and 16 Contributor Banks for each of the five LIBOR currencies. Each Contributor Bank contributes input data for all seven LIBOR tenors in every currency in respect of which it is on a panel.[10]

101.    According to the IBA, its LIBOR Oversight Committee considers the following criterion for eligibility on the Contributor Bank Panels:  (1) transactional activity overall; (2) expertise in wholesale markets; (3) bank size; (4) credit quality; (5) reputational standing; (6) types and mix of transactional activity and bank sources of funding; and (7) geographical reach of banks.[11]

---

[9] https://www.theice.com/publicdocs/ICE_LIBOR_Roadmap0316.pdf, at p. 5.
[10] https://www.theice.com/iba/libor and
https://www.theice.com/publicdocs/ICE_LIBOR_Roadmap0316.pdf, at p. 5.
[11] https://www.theice.com/publicdocs/Policy_Composition_ICE_LIBOR_Panels.pdf

*First Amended Complaint for Violations of §§ 1 and 2 of the Sherman Act*

102.    The following table shows the panel composition for USD LIBOR as of the filing of the original complaint in August, 2022:



103.    Defendants Bank of America, Barclays, Citibank, Rabobank, Credit Suisse, Deutsche Bank, HSBC, JPMorgan Chase, Lloyds Bank, MUFG Bank, NatWest/Royal Bank of Scotland, Royal Bank of Canada (settled defendant), Sumitomo, Norinchukin (settled defendant), and UBS were IBA Contributor Banks for the USD LIBOR panel in August of 2022.

104.    Current USD LIBOR panel banks are Bank of America, Barclays, Citibank, Rabobank, Credit Agricole, Credit Suisse, Deutsche Bank, JPMorgan Chase, Lloyds Bank, MUFG Bank, Royal Bank of Canada, Sumitomo (SMBC), Norinchukin and UBS.

105.    LIBOR is calculated by the IBA based on submissions from the Contributor Banks through the use of a "Waterfall Methodology" which includes the following levels: (1) "Transaction-Based" Data, with a greater weighting of transactions booked closer to 11:00

*First Amended Complaint for Violations of §§ 1 and 2 of the Sherman Act*

a.m. London time; (2) "Transaction-Derived" Data, including time-weighted historical eligible transactions adjusted for market movements and linear interpolation; and (3) "Expert Judgment," market and transaction data based "expert judgment," using the bank's own internally approved procedure.[12]

106.    IBA calculates LIBOR using a trimmed arithmetic mean. Once all submissions are received from the Contributor Banks, they are ranked in descending order and then the highest and lowest quartiles of submissions are excluded to remove outliers from the final calculation. A mean is calculated from the remaining middle quartiles, rounded to five decimal places.  Each Contributor Bank's submission carries an equal weight in the calculation, subject to the trimming.[13]

107.    LIBOR is not truly set on what the contributor panel banks actually pay to borrow funds from each other, rather it is set based upon the panel banks' submissions related to what they think they would pay.

---

[12] https://www.theice.com/iba/libor
[13] https://www.theice.com/publicdocs/ICE_LIBOR_Roadmap0316.pdf, at p. 16.

*First Amended Complaint for Violations of §§ 1 and 2 of the Sherman Act*



108.    As a further example of the rate setting process highlighting that the lower rates submitted by the panel banks (which are identified as of the date of the filing of the original complaint) are rejected as "outliers", plaintiff submits the following charts prepared by ICE LIBOR:



1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

libor1.gif 372×350 pixels                                                                                    12/30/20, 11:11 AM



| BANK | 3-MO. RATE |
| --- | --- |
| HBOS | 2.75000% |
| Credit Suisse | 2.74000 |
| Bank of America | 2.73000 |
| J. P. Morgan Chase | 2.72000 |
| HSBC | 2.72000 |
| Bank of Tokyo-Mitsubishi | 2.72000 |
| Barclays | 2.72000 |
| Norinchukin Bank | 2.72000 |
| Royal Bank of Canada | 2.71750 |
| Lloyds | 2.71000 |
| Westdeutsche Landesbank | 2.71000 |
| Rabobank | 2.71000 |
| UBS AG | 2.71000 |
| Royal Bank of Scotland | 2.70500 |
| Deutsche Bank | 2.70000 |
| Citigroup | 2.70000 |

**Calculating Libor**
A look at how Tuesday's London inter-bank offered rate was calculated:

Between 11 and 11:10 a.m. London time, the 16 banks at left report the rates at which they borrow from other banks.

**Tuesday's 3-month U.S. dollar Libor:**
2.71594%

The two center quartiles are averaged, and the day's Libor rate is published at about 11:30 a.m. GMT.

Sources: British Bankers' Association; Reuters

http://www.cringely.com/wp-content/uploads/2013/07/libor1.gif                                      Page 1 of 1

109.    The following chart is an example that shows the difference between the fixed

rate and the lowest submission for seven tenors over a period of several days. The difference is

*First Amended Complaint for Violations of §§ 1 and 2 of the Sherman Act*

substantial in every case.  This is the fixed rate less the lowest submission (otherwise called by LIBOR as the "outlier" rate).

| RATE_DATE | TENOR_CODE | LOWEST RATE | SET RATE | DIFFERNCE B/W LOWEST & |
|---|---|---|---|---|
| 03-Feb-2014 | 12M | 0.4 | 0.5629 | 0.1629 |
| 03-Feb-2014 | 1M | 0.125 | 0.1571 | 0.0321 |
| 03-Feb-2014 | 1W | 0.09 | 0.12075 | 0.03075 |
| 03-Feb-2014 | 2M | 0.16 | 0.19975 | 0.03975 |
| 03-Feb-2014 | 3M | 0.19 | 0.2356 | 0.0456 |
| 03-Feb-2014 | 6M | 0.22 | 0.3335 | 0.1135 |
| 03-Feb-2014 | ON | 0.055 | 0.0855 | 0.0305 |
| 06-May-2014 | 12M | 0.39 | 0.5436 | 0.1536 |
| 06-May-2014 | 1M | 0.12 | 0.1505 | 0.0305 |
| 06-May-2014 | 1W | 0.09 | 0.1225 | 0.0325 |
| 06-May-2014 | 2M | 0.15 | 0.18925 | 0.03925 |
| 06-May-2014 | 3M | 0.18 | 0.22485 | 0.04485 |
| 06-May-2014 | 6M | 0.22 | 0.3229 | 0.1029 |
| 06-May-2014 | ON | 0.07 | 0.0905 | 0.0205 |
| 08-Sep-2014 | 12M | 0.415 | 0.5626 | 0.1476 |
| 08-Sep-2014 | 1M | 0.12 | 0.1535 | 0.0335 |
| 08-Sep-2014 | 1W | 0.09 | 0.11985 | 0.02985 |
| 08-Sep-2014 | 2M | 0.15 | 0.1953 | 0.0453 |
| 08-Sep-2014 | 3M | 0.18 | 0.2336 | 0.0536 |
| 08-Sep-2014 | 6M | 0.23 | 0.3263 | 0.0963 |
| 08-Sep-2014 | ON | 0.065 | 0.091 | 0.026 |
| 08-Dec-2014 | 12M | 0.4 | 0.6031 | 0.2031 |
| 08-Dec-2014 | 1M | 0.13 | 0.1617 | 0.0317 |
| 08-Dec-2014 | 1W | 0.105 | 0.1366 | 0.0316 |
| 08-Dec-2014 | 2M | 0.15 | 0.203 | 0.053 |
| 08-Dec-2014 | 3M | 0.19 | 0.2376 | 0.0476 |
| 08-Dec-2014 | 6M | 0.25 | 0.3399 | 0.0899 |
| 08-Dec-2014 | ON | 0.09 | 0.111 | 0.021 |
| 03-Feb-2015 | 12M | 0.45 | 0.61815 | 0.16815 |
| 03-Feb-2015 | 1M | 0.145 | 0.171 | 0.026 |
| 03-Feb-2015 | 1W | 0.11 | 0.136 | 0.026 |
| 03-Feb-2015 | 2M | 0.17 | 0.2085 | 0.0385 |
| 03-Feb-2015 | 3M | 0.21 | 0.2551 | 0.0451 |
| 03-Feb-2015 | 6M | 0.28 | 0.3588 | 0.0788 |
| 03-Feb-2015 | ON | 0.09 | 0.1175 | 0.0275 |
| 06-May-2015 | 12M | 0.555 | 0.7341 | 0.1791 |
| 06-May-2015 | 1M | 0.15 | 0.18025 | 0.03025 |
| 06-May-2015 | 1W | 0.12 | 0.1453 | 0.0253 |
| 06-May-2015 | 2M | 0.19 | 0.2279 | 0.0379 |
| 06-May-2015 | 3M | 0.22 | 0.276 | 0.056 |
| 06-May-2015 | 6M | 0.34 | 0.4164 | 0.0764 |
| 06-May-2015 | ON | 0.085 | 0.123 | 0.038 |
| 08-Sep-2015 | 12M | 0.72 | 0.8568 | 0.1368 |
| 08-Sep-2015 | 1M | 0.16 | 0.203 | 0.043 |
| 08-Sep-2015 | 1W | 0.135 | 0.154 | 0.019 |
| 08-Sep-2015 | 2M | 0.2 | 0.26855 | 0.06855 |

*First Amended Complaint for Violations of §§ 1 and 2 of the Sherman Act*

110.     LIBOR interest rates are jointly set by the Co-Conspirator Defendants. Defendants-Co-Conspirators and their co-conspirator banks and credit card companies in the United States agree to use and do use USD LIBOR as a component of the interest charged in fixed and variable interest rate loans  on credit cards in the United States. Variable and fixed interest rate loans and credit tied to USD LIBOR include fixed and variable rate mortgages, asset backed securities, lines of credit, municipal bonds, credit default swaps, credit card debt, student loans, auto loans and other forms of debt.  As of 2019, $1.2 trillion worth of residential mortgage loans and $1.3 trillion of consumer loans had been priced using LIBOR.



**Variable Interest Rate Consumer Loans Tied to LIBOR**

LIBOR %

Variable rate mortgages | Lines of credit | Credit card debt | Student loans | Other forms of consumer debt

111.     LIBOR-based loans work as follows:  If one applies for a loan based on LIBOR, the financial firm offering the loan will take the LIBOR rate for the date the loan is quoted and add an additional percentage, say 2%.  For a private mortgage loan based upon the LIBOR three-month rate, for example, if the LIBOR rate was 1.15%, the base rate for the loan would be 3.15%.   If the loan is an adjustable loan, the lender sets regular periods when it makes changes to the rate being charged.  The lender references LIBOR when adjusting the

interest rate on the loan, changing the amount paid each month during the period of adjustment.

112.    The LIBOR rate is a base rate based upon a trimmed average of contributing banks.  Contrary to the agreed-upon trimmed rate set by LIBOR and its contributor panel banks, a reasonable estimate of the actual competitive rate that a borrower would pay - absent the LIBOR price trimming conspiracy – would be the lowest four rates that are submitted by the four lowest Contributor Banks on any particular rate setting date, which four rates are excluded from the LIBOR trim average by virtue of Defendants' unlawful combination or conspiracy.

113.    Each Defendant panel bank sought to maximize its potential profit by agreeing to use LIBOR.  Each of the panel banks specifically intended that the published LIBOR interest rate for USD LIBOR would exceed by a significant amount the lowest of the four lowest interest rates for USD LIBOR submitted by the USD LIBOR panel banks.  The purpose of the calculation whereby the USD LIBOR rate would be set on a trim average was to insure that the USD LIBOR rate would exceed the lowest suggested rate submitted by a panel bank.  The purpose was to insure that the effective, published LIBOR rate would be more that the lowest competitive rate.  The purpose was to insure that there would be a significant profit for the participating panel banks and for any bank that adopted the LIBOR published rate, because the LIBOR rate would always be more than the lowest of the other competitive banks.  The defendants agreed to maximize their profits by setting a rate above the lowest rates submitted by the other panel banks.

114.    Each USD LIBOR Contributor bank agrees to adhere to the LIBOR Code of Conduct established by IBA, thus cementing the conspiracy to set prices on interest rates.

115.    The LIBOR Code of Conduct established by the IBA, "sets out the framework within which LIBOR Contributor Banks are expected to operate."[14]

116.    Under the LIBOR Code of Conduct, each Contributor Bank's "submitters and their direct managers *must acknowledge in writing that they have read the [LIBOR] code of conduct and that they will comply with it*."[15]

117.    Under the LIBOR Code of Conduct, a "Contributor Bank is required to formulate its LIBOR Submissions in accordance with the methodology requirements published by IBA at: https://www.theice.com/publicdocs/ICE_LIBOR_Methodology.pdf."[16]

118.    Under the LIBOR Code of Conduct, each Contributor Bank is required to make, "Submissions….between 11.05 and 11.39.59 on each London business day. Submissions received at or after 11.40 will be regarded as late.  If a bank makes frequent late Submissions, the matter will be reported to the LIBOR Oversight Committee…"[17]

119.    Under the LIBOR Code of Conduct, each Contributor Bank is required to maintain, "written policies and procedures designed to ensure that this LIBOR Code is implemented and systematically applied within the Contributor Bank…"[18]

120.    Under the LIBOR Code of Conduct, each Contributor Bank must, "ensure that appropriate records are kept of its business and internal organisation, which must be available

---

[14] https://www.theice.com/publicdocs/LIBOR_Code_of_Conduct_Issue_7_Current.pdf, at p. 3.

[15] https://www.theice.com/publicdocs/LIBOR_Code_of_Conduct_Issue_7_Current.pdf, at p. 31.

[16] https://www.theice.com/publicdocs/LIBOR_Code_of_Conduct_Issue_7_Current.pdf, at p. 8.

[17] https://www.theice.com/publicdocs/LIBOR_Code_of_Conduct_Issue_7_Current.pdf, at p. 9

[18] https://www.theice.com/publicdocs/LIBOR_Code_of_Conduct_Issue_7_Current.pdf, at p. 14.

*First Amended Complaint for Violations of §§ 1 and 2 of the Sherman Act*

to IBA on request, to the extent permitted by applicable law, in order to monitor the bank's compliance with the requirements under [the] LIBOR Code [of Conduct]."[19]

121.    By agreeing to comply and adhere to the terms set forth in the LIBOR Code of Conduct, the Contributor Banks agree to fix and set the interest rates of USD LIBOR.

122.    Further, the LIBOR Code of Conduct is overseen and enforced by the IBA's "LIBOR Oversight Committee," which has "broad market representation, being comprised of Contributor Banks, benchmark users, market infrastructure providers, independent non-executive directors of IBA, and other relevant experts. Representatives from the Board of Governors of the Federal Reserve System, the Swiss National Bank and the Bank of England also sit on the committee as observers."[20]

123.    The LIBOR Oversight Committee, which is composed of some Defendants and other unnamed co-conspirators, is responsible for, "Reviewing the methodology, scope and definition of the benchmark (including assessing its underlying market and usage); Overseeing any changes to the benchmark; and Overseeing and reviewing the LIBOR Code of Conduct."[21]

124.    The members of the LIBOR Oversight Committee as of December 2019 were as follows:[22]

---

[19] https://www.theice.com/publicdocs/LIBOR_Code_of_Conduct_Issue_7_Current.pdf, at p. 28.
[20] https://www.theice.com/iba/libor
[21] https://www.theice.com/iba/libor
[22] https://www.theice.com/publicdocs/LIBOR_Oversight_Committee_Disclosures_of_Conflicts_of_Interest.pdf

*First Amended Complaint for Violations of §§ 1 and 2 of the Sherman Act*

| First Name | Surname | Company | Committee Position |
|---|---|---|---|
| Paula | Madoff | ICE Benchmark Administration (Independent Non-Executive Director) | Chairwoman |
| Timothy J | Bowler | ICE Benchmark Administration (President) | Ex Officio |
| David | Bowman | Federal Reserve System (Associate Director - Division of International Finance) | Observer |
| Steve | Bullock | Lloyds Bank (Head of Benchmark Submission and Supervision) | Contributor of Input Data representative |
| David | Clark | EVIA (Chairman) | Association representative |
| Clare | Dawson | LMA (Chief Executive) | Association representative |
| Galina | Dimitrova | The Investment Association (Director, Investments and Capital Markets) | Association representative |
| Angus | Graham | UBS (Group Finance) | Contributor of Input Data representative |
| John | Grout | Independent | Independent Expert |
| George | Handjinicolaou | Piraeus Bank (Chairman) | Financial Intermediary representative |
| Matthias | Jüttner | Swiss National Bank (Assistant Director - Money Market) | Observer |
| Candice | Koederitz | ICE Benchmark Administration (Independent Non-Executive Director) | Independent Non-Executive Director |
| Will | Parry | Bank of England (Senior Manager - Sterling Markets Division) | Observer |
| David | Peniket | ICE Futures US (Director) | Market Infrastructure Provider representative |
| Rob | Thurlow | Mizuho Corporate Bank (Head of ALM / Benchmark Manager) | Contributor of Input Data representative |
| Kathleen | Yoh | Independent | Independent Expert |

*First Amended Complaint for Violations of §§ 1 and 2 of the Sherman Act*

125.    Each of the above-identified members of the LIBOR Oversight Committee specifically intended that the published LIBOR interest rate for USD LIBOR exceed the lowest four interest rates for USD LIBOR submitted by the USD LIBOR panel banks.  The purpose of the calculation whereby the USD LIBOR rate would be set on a trim average was to insure that the USD LIBOR rate would exceed the lowest suggested rate submitted by a panel bank.  The purpose was to insure that the effective, published LIBOR rate would be more that the lowest competitive rate.  The purpose was to insure a profit for the participating panel banks and for any bank that adopted the LIBOR published rate.

126.    In 2018-2019, the IBA conducted two surveys to determine and agree upon which LIBOR settings would be produced after 2021.[23]

127.    The IBA plans on "[u]sing the results of this survey and other outreach work…[to] work with globally active banks to seek to publish certain LIBOR settings after year-end 2021."[24]

128.    The survey explains that, "The primary goal of IBA's work in seeking to obtain sufficient banking industry support to publish certain LIBOR settings after year-end 2021 is to provide these settings to users with outstanding LIBOR-linked contracts that are impossible or impractical to modify."[25]

---

[23] https://www.tactweb.org/media/2019/01/2019.05.02-LIBOR-Working-Group.pdf, at p. 3.
[24] https://www.theice.com/publicdocs/Results_of_the_IBA_Survey_on_the_use_of_LIBOR.pdf, at p. 2.
[25] https://www.theice.com/publicdocs/Results_of_the_IBA_Survey_on_the_use_of_LIBOR.pdf, at p. 2

*First Amended Complaint for Violations of §§ 1 and 2 of the Sherman Act*

129.    The first survey of its existing global Panel Banks sought "to identify the LIBOR settings that are critical to the global financial system." The results of that survey were never made public.[26]

130.    The second survey of LIBOR end-users sought to determine which LIBOR settings were most commonly used.[27]

131.    The results of the survey were published in March 2019 and included feedback from 109 Respondents. According to the minutes of a LIBOR Trade Association Working Party Meeting held in May 2019, the overwhelming majority of survey respondents focused on lending activities when asked to set out the main uses of currency and tenor pairs that they used the most.

132.    According to the minutes of a LIBOR Trade Association Working Party Meeting held in May 2019, the IBA is now focusing on engaging with panel and potential panel banks to seek their commitment to providing continued submissions in respect of those tenor and currency pairs after 2021.[28]

133.    In response to the question, "IBA would like to understand which LIBOR currency and tenor pairs you and/or your organisation use the most and for which you would like to see IBA work to seek an agreement with globally active banks to support publication after 2021," the top three currency/tenor pairs selected by the second survey's respondents were as follows: (1) USD LIBOR 3 Month; (2) USD LIBOR 1 Month; and (3) the USD LIBOR 6 Month.[29]

---

[26] https://www.tactweb.org/media/2019/01/2019.05.02-LIBOR-Working-Group.pdf, at p. 3.
[27] https://www.tactweb.org/media/2019/01/2019.05.02-LIBOR-Working-Group.pdf, at p. 3.
[28] https://www.tactweb.org/media/2019/01/2019.05.02-LIBOR-Working-Group.pdf, at p. 3-4.
[29] https://www.theice.com/publicdocs/Results_of_the_IBA_Survey_on_the_use_of_LIBOR.pdf, at p. 5.

*First Amended Complaint for Violations of §§ 1 and 2 of the Sherman Act*

134.    In response to the question, "IBA would like to understand which LIBOR currency and tenor pairs you and/or your organisation use the most and for which you would like to see IBA work to seek an agreement with globally active banks to support publication after 2021," out of 109 responses, the number of respondents selecting the USD currency/tenor pairs are as follows[30]:

- Over 90 respondents selected the 3-month USD LIBOR currency/tenor pair.

- Over 75 respondents selected the 1-month USD LIBOR currency/tenor pair.

- Over 65 respondents selected the 6-month USD LIBOR currency/tenor pair.

- Over 35 respondents selected the 12-month USD LIBOR currency/tenor pair.

- Over 35 respondents selected the overnight USD LIBOR currency/tenor pair.

- 30 respondents selected the 1-week USD LIBOR currency/tenor pair.

- Over 25 respondents selected the 2-month USD LIBOR currency/tenor pair.

135.    In response to the survey question, "Please set out the main uses of the currency and tenor pairs you use the most," the following number of co-conspirator banks and other institutions surveyed responded that they mainly use the following USD LIBOR currency/tenor pairs for, "Retail products (e.g. consumer loans, credit cards, mortgages, investment products):

| 1 Month USD LIBOR | 1 |
|---|---|
| 3-Month USD LIBOR | 2 |
| 6-Month USD LIBOR | 2 |
| 12-Month USD LIBOR | 4 |

---

[30] https://www.theice.com/publicdocs/Results_of_the_IBA_Survey_on_the_use_of_LIBOR.pdf, at p. 10.

*First Amended Complaint for Violations of §§ 1 and 2 of the Sherman Act*

136.    The IBA survey therefore illustrates the agreement, combination and conspiracy, between and among Defendants and its unnamed co-conspirators to use and continue to use the USD LIBOR as a component of the price in fixed and variable interest rate loans.

## THE DEFENDANTS ARE SERIAL VIOLATORS OF THE ANTITRUST LAWS AND MUST BE BROKEN-UP

137.    These Defendants have abused their size by violating the antitrust laws on numerous occasions.  Their violations have caused tremendous damage to the victims.  In this case they have agreed to a formula to fix the price of the intra-bank interest rate used throughout the world.  They have pled guilty or admitted to regulatory agencies that they have fixed the exchange rate in the foreign exchange markets.  They have been proved to have fixed the price on the interchange fees in the credit card and debit card market.  Although not sued, they caused the 2007-2008 mortgage crisis which resulted in devastating foreclosures throughout the country.

138    These Defendants have been pampered and have been given special consideration by government officials, as was stated by Timothy F. Geithner, former Secretary of the Treasury, in his book, *Stress Test*, subtitled "Reflections on the Financial Crisis"*,* at page 392*:*

"Related to the theory that size caused the crisis was the theory that moral hazard caused the crisis, that 'too big to fail' banks took on so much risk because they knew the government would bail them out if they got in trouble.  There was certainly moral hazard in our system.  Traditional banks did enjoy a mix of explicit and implicit

*First Amended Complaint for Violations of §§ 1 and 2 of the Sherman Act*

government protection, advantages that were not sufficiently offset by constraints on their risk-taking."

139.   Secretary Geithner also specifically stated that each of the Defendants has developed a plan for their dismemberment should any of them violate the law again:

"Larger firms were also required to submit 'living wills' to their supervisors, emergency protocols proposing how they could be safely dismembered. . . More than one hundred financial firms now have blueprints  for their breakup in case they run into trouble."  (Page 429.)

140.   Of course, subsequently, the Defendants continued to violate the law and even organized new conspiracies to fix prices and were forced to plead guilty in 2015 for fixing prices and agreeing to eliminate competition in the purchase and sale of US Dollars and Euros and other foreign currencies.

141.   The former Chairman of the Federal Reserve, Ben S. Bernanke, the former Secretary of the Treasury, Henry Paulson Jr., and Timothy Geithner, the former President of the Federal Reserve of New York, in their book entitled *Firefighting*, subtitled, "The Financial Crisis and Its Lessons", attributed the financial crisis of 2007-2008 to "The rise of 'too big to fail' institutions, and the ubiquity of murky derivatives backed by shoddy mortgages."  As noted above, LIBOR has been partially responsible for the 2007-2008 crisis because of the rising cost at that time of LIBOR financed mortgages and the fact that the banks, being too big to fail, could be held accountable.

**VIOLATIONS ALLEGED**

**Sherman Act, Section 1, 15 U.S.C. § 1**

142.   Plaintiffs incorporate by reference the preceding allegations.

143.   Defendants and their unnamed co-conspirators entered into and engaged in a conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act.

144.   Defendants' unlawful combination or conspiracy is an unlawful agreement to fix prices and is a *per se* violation of the antitrust laws.

145.   During the preceding four years, Defendants set and controlled LIBOR and therefore controlled the interest rates of consumer loans and credit cards tied LIBOR offered and sold by them and their co-conspirators.

146.   The conspiracy consisted of a continuing agreement, understanding or concerted action between and among Defendants and their co-conspirators in furtherance of which Defendants fixed the LIBOR interest rate pursuant to a formula that would insure that the LIBOR rate exceeded the lowest competitive rate of any of the competitor panel banks and thus insured that the prices and interest rates on consumer loans and credit cards and other financial instruments with rates tied to LIBOR that were published, offered, sold, and serviced by Defendants and their co-conspirators would generate a profit to the Defendants.  The conspiracy and agreement among the Defendants was to fix, publish and promulgate and cause the use of  the fixed LIBOR rate by banks and financial institutions in the United States and worldwide.  All Defendants agreed to use the LIBOR rate that was fixed by formula and all agreed to cause the use of the LIBOR rate by other financial institutions worldwide.

147.   Defendants did what they intended to do and, by fixing, publishing and promulgating the LIBOR rate, Defendants have caused other banks and financial institutions to use and include the LIBOR rate in the sale of their financial transactions and instruments for loans,

- 54 -

credit and otherwise.  Defendants have been successful in their promulgation of the LIBOR rate and financial institutions throughout the world have adopted the illegally fixed rate and Plaintiffs have purchased financial products from these institutions that have contained the LIBOR price fix.

148.    Defendants' conspiracy is a *per se* violation of the federal antitrust laws and is, in any event, an unreasonable and unlawful restraint of trade and commerce.

149.    Defendants' conspiracy, and the resulting impact on the market for LIBOR-based consumer loans and credit cards occurred in or affected interstate and foreign commerce.

150.    As a proximate result of Defendants' unlawful conduct, Plaintiffs have suffered injury to their business or property in that they have paid more for loans than they otherwise would have paid absent the conspiracy to set the LIBOR base rate.  *Reiter v. Sonotone Corp.*, 442 U.S. 330 (1979).

151.    Plaintiffs have been injured and will continue to be injured in their business and property as a result of Defendants' conduct, by way of paying anticompetitive prices for fixed and variable rate interest loans and credit cards.  *See* 15 U.S.C. § 15.

152.    The Plaintiffs are each entitled to preliminary and permanent injunctive relief under Section 16 of the Clayton Antitrust Act, 15 U.S.C. § 26, for Defendants' violations of the Sherman Act alleged herein, and to recover their cost of suit, including a reasonable attorney's fee.

## **Sherman Act, Section 2, 15 U.S.C. § 2 – Conspiracy to Monopolize**

153.    Plaintiffs incorporate by reference the preceding allegations.

154.    Defendants and their unnamed co-conspirators entered into and engaged in a conspiracy to monopolize in violation of Section 2 of the Sherman Act.

155.    During the preceding four years, Defendants set and controlled LIBOR and therefore controlled the interest rates of consumer loans and credit cards tied LIBOR offered and sold by them and their co-conspirators.

156.    Defendants have the specific intent to achieve monopoly power in the relevant

market, as alleged in the paragraphs above.

157.    In furtherance of the conspiracy, Defendants and have committed several overt acts as set out herein.

158.    Defendants' conspiracy, and the resulting impact on the market for LIBOR-based consumer loans and credit cards occurred in or affected interstate and foreign commerce.

159.    As a proximate result of Defendants' unlawful conduct, Plaintiffs have suffered injury to their business or property.

160.    Plaintiffs have been injured and will continue to be injured in their business and property as a result of Defendants' conduct, by way of paying anticompetitive prices for fixed and variable rate interest loans and credit cards.  *See* 15 U.S.C. § 15.

161.    The Plaintiffs are each entitled to preliminary and permanent injunctive relief under Section 16 of the Clayton Antitrust Act, 15 U.S.C. § 26, for Defendants' violations of the Sherman Act alleged herein, and to recover their cost of suit, including a reasonable attorney's fee.

### **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs demand the following relief from this Honorable Court:

A.    Declaring, finding, adjudging, and decreeing that the unlawful conduct alleged herein be adjudged and decreed to be in violation of Section 1 of the Sherman Act;

B.    Declaring, finding, adjudging, and decreeing that the unlawful conduct alleged herein be adjudged and decreed to be an unlawful restraint of trade in violation of Section 2 of the Sherman Act;

C.    That Defendants, their subsidiaries, affiliates, successors, transferees, assignees and the respective officers, directors, partners, agents, and employees and all other persons acting or claiming to act on their behalf, be prohibited from continuing and maintaining the conspiracy alleged in the Complaint;

*First Amended Complaint for Violations of §§ 1 and 2 of the Sherman Act*

D.      Declaring, finding, adjudging, and decreeing that the LIBOR portion of any agreement that includes LIBOR as a component of the fixed and variable interest rate charged is illegal and void under the antitrust laws of the United States;

E.      Prohibit the Defendants from enforcing the LIBOR portion of any agreement for LIBOR-based fixed and variable interest rate loans or credit cards, in whole or in part;

F.      Prohibit the Defendants from combining and conspiring to agree upon another so-called benchmark rate to replace LIBOR;

G.      Requiring that Defendants disgorge their profits to the United States Treasury as determined by the actual rates charged less the lowest rate submission;

H.      Requiring that the Defendants be divested and divided in accordance with the protocols and blueprints that they were previously required to formulate if they engaged in any further violations;

I.      Awarding to Plaintiffs treble damages under Section 4 of the Clayton Antitrust Act, 15 U.S.C. §§ 15, 26.

J.      Awarding to Plaintiffs costs of suit, including a reasonable attorney's fee as provided by Sections 4 and 16 of the Clayton Antitrust Act, 15 U.S.C. §§ 15, 26.

K.      Granting to Plaintiffs such other and further relief to which they may be entitled and which the Court finds to be just and appropriate.

## JURY TRIAL DEMANDED

Plaintiffs Lisa McCarthy, *et al.,* demand a trial by jury as their right under the Seventh Amendment to the Constitution of the United States or as given by statute. Fed. R. Civ. P. 38.

Dated: October 4, 2022                    **ALIOTO LAW FIRM**


                              By:   */s/ Joseph M. Alioto*
                                    Joseph M. Alioto (SBN 42680)
                                    Tatiana V. Wallace, Esq. (SBN 233939)
                                    ALIOTO LAW FIRM
                                    One Sansome Street, 35th Floor
                                    San Francisco, CA  94104
                                    Telephone:  (415) 434-8900
                                    Email:  jmalioto@aliotolaw.com

*First Amended Complaint for Violations of §§ 1 and 2 of the Sherman Act*

1

**PLAINTIFFS' COUNSEL**

2

3    Lawrence G. Papale (SBN 67068)          Robert J. Bonsignore (SBN
     LAW OFFICES OF LAWRENCE G.             BONSIGNORE TRIAL LAWYERS, PLLC
4    PAPALE                                  23 Forest Street
     1308 Main Street, Suite 117             Medford, MA 02155
5    St. Helena, CA 94574                    Phone: 781-856-7650
     Telephone: (707) 963-1704               Email: rbonsignore@classactions.us
6    Email: lgpapale@papalelaw.com

7    Theresa D. Moore (SBN 99978)            Josephine Alioto (SNB 282989)
     LAW OFFICE OF THERESA D.               THE VEEN FIRM
8    MOORE PC                                20 Haight Street
     One Sansome Street, 35th Floor          San Francisco CA 94102
9    San Francisco, CA 94104                 Telephone: (415) 673-4800
     Phone: (415) 613-1414                   Email: jalioto@veenfirm.com
10   tmoore@aliotolaw.com

11

12   Christopher A Nedeau (SBN 81297)        Lingel H. Winters, Esq. (SBN 37759)
     NEDEAU LAW PC                          LAW OFFICES OF LINGEL H. WINTERS
13   154 Baker Street                        388 Market St. Suite 1300
     San Francisco, CA 94117-2111            San Francisco, California 94111
14   Telephone: (415) 516-4010               Telephone: (415) 398-2941
     Email: cnedeau@nedeaulaw.net            Email: sawmill2@aol.com
15

16   Jeffrey K. Perkins (SBN 57996)
     LAW OFFICES OF JEFFREY K.
17   PERKINS
     1550-G Tiburon Boulevard, #344
18   Tiburon, California 94920
     Telephone: (415) 302-1115
19   Email: jeffreykperkins@aol.com

20

21

22

23

24

25

26

27

28

*First Amended Complaint for Violations of §§ 1 and 2 of the Sherman Act*